SUMMONS ISSUED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

JOHN M., Individually, and in his capacity as Parent
of Giovanni M., a Disabled Student, MICHELE M.,
Individually, and in her capacity as Parent of Giovanni M.,
a Disabled Student, and GIOVANNI M.

                                    Plaintiffs,

                  - against -

BRENTWOOD UNION FREE SCHOOL DISTRICT,

                                    Defendant.

------------------------------------------------------------------------x

**CV 12 2603**

COMPLAINT

TRIAL BY JURY
DEMANDED

BIANCO, J.
BROWN, M. J.

FILED
U.S. IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  MAY 23 2012  ★

LONG ISLAND OFFICE

        Plaintiffs, JOHN M., Individually, and in his capacity as Parent of Giovanni M., a

Disabled Student, MICHELE M., Individually, and in her capacity as Parent of Giovanni M., a

Disabled Student, and GIOVANNI M. respectfully allege as follows:

## NATURE OF THE ACTION

        1.      This action is commenced for the purpose of seeking redress for actions of the

defendant which give rise to liability to plaintiffs under 20 U.S.C. § 1415; i.e., the Individuals with

Disabilities Education Act (hereinafter, "IDEA"); 29 U.S.C. § 794; Section 504 of the Rehabilitation

Act, and 42 U.S.C. § 12101; i.e., the Americans with Disabilities Act (hereinafter "ADA"). This

action seeks, in addition to all relief otherwise provided for by law; punitive damages.

## JURISDICTION AND VENUE

        2.      This court has jurisdiction over the claims pursuant to 28 U.S.C. § 1331,

28 U.S.C. § 1343 (a) (3) and (4), 20 U.S.C. § 1415 (i) (2).

        3.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c),

because defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT resides in this district and a substantial part of the events and/or omissions giving rise to this claim occurred in this district.

## THE PARTIES

4.     Plaintiff, JOHN M. is a parent of Giovanni M., who, at all times relevant herein, was a disabled student within the meaning of the IDEA, and a citizen of the United States and of the State of New York and resident of the County of Suffolk.

5.     Plaintiff, MICHELE M. is a parent of Giovanni M., who, at all times relevant herein, was a disabled student within the meaning of the IDEA, and a citizen of the United States and of the State of New York and resident of the County of Suffolk.

6.     Plaintiff, GIOVANNI M. (hereinafter, "G.M."), at all times relevant herein, was a disabled student within the meaning of the IDEA, and a citizen of the United States and of the State of New York and resident of the County of Suffolk.

7.     Defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT (hereinafter, referred to as "the District") is a school district organized and existing pursuant to the laws of the state of New York.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

8.     At all times relevant herein, G.M. was a student of the District and attended schools in the District from kindergarten through November, 2008 when defendant removed him from Brentwood High School; Sonderling High School Center ("Sonderling").

9.     In the Fall of 2007 and continuing until he was removed from school in November, 2008, G.M. was subjected to racial remarks, taunts, epitaphs, episodes of spitting, and physical

assaults inflicted by non-Caucasian students at the District. These incidents included, but were not limited to, those set forth below;

    a.    During the 2007-2008 school year, during science class, G.M. was subjected to repeated racial taunts by a group an African-American, female classmate; ("Diamond") as well as other African-American and Asian, female classmates, i.e., "white boy" and "cracker". Following these incidents, G.M. repeatedly complained to his teacher about the harassment. Other than temporarily separating the group for a brief period, the District took no action to prevent future reoccurrences, and the harassment continued.

    b.    During the same school year, G.M. experienced similar incidents of racial harassment at lunch and during art class. While in art class, G.M. was told by "Krumps"; an African-American, male classmate "Jesus is going to condemn the white man". When G.M. complained to his art teacher, Ms. Thompson, he was allowed to move his seat to another location in the room but the harassment continued.

    c.    On another occasion, during lunch, G.M. was punched in the back of the head by an African-American, female classmate. Following this incident, G.M's parents met with the Dean of Discipline who advised the parents that the girl had been placed on probation. As result, racial taunts of a similar nature were directed at G. M. as the school year progressed, by African-American classmates.

    d.    In September of the ensuing 2008-2009 school year, "Ashley"; an African-

American, female classmate grabbed the seat G.M. had been sitting on in the cafeteria and hit him with it.

e.     Also, within two (2) weeks of the commencement of the 2008-2009 school year, G.M. was in the hall speaking to his science teacher, Ms. Shea, when an unidentified, African-American, male classmate pushed him in the back and called him a "cracker". Ms. Shea told G.M. that she had observed the unidentified, African-American, male classmate strike him and accompanied him, the next day, when G.M. reported the incident to Linda Pappert, the Vice-Principal of Brentwood High School; Sonderling High School Center. G.M.'s mother, plaintiff, MICHELE M. also met with the Ms. Pappert who, while acknowledging the incident, blamed G.M. saying it was attributable to the way he carried himself and his purported failure to project an air of self-confidence. When claimant's parents requested that he be allowed to switch a couple of classes so that he could be in classes with his friend, Ms. Pappert refused. Ms. Pappert indicated that she would monitor the situation and periodically meet with G.M. to see how he was doing however failed to do so. Similarly, Kerin Adacki, the School Psychologist at Brentwood High School, indicated she would meet with G.M. one time per week but also failed to do so.

f.     Similar instances of racial harassment continued to occur. On one occasion, G.M. was walking up a flight of stairs at school when an African-American student spat on him and said "move it cracker"; an incident which G.M. also

reported to Ms. Pappert.

g.  The harassment culminated in a confrontation on November 5, 2008. On that day, while in the hallway, G.M. accidently bumped into a male, African-American student. Claimant apologized to the student whereupon the student, together with a group of other African-American students, began cursing at claimant and uttering racial epitaphs; e.g., "cracker", "white boy".

10.  After this last incident, G.M. became emotionally despondent and depressed. He told his mother that he did not feel safe at school; felt like someone was going to kill him and that he had nobody to protect him because the school would not do anything about the harassment. The day after the incident, G.M.'s mother expressed her concerns to G.M.s guidance counselor; Jessica Rodriguez. G.M. began to have trouble sleeping and began having nightmares. At Ms. Rodriguez' recommendation, G.M was seen by David Goldfarb, the School Social Worker at Brentwood High School.

11.  On November 13, 2008, G.M. was seen by Ms. Adacki. Upon information and belief, no psychological testing was conducted. Later that same day plaintiff, MICHELE M. was summoned to a meeting with Mr. Goldfarb, Ms, Adacki and Ms. Pappert, who advised her that G.M. was being removed from school, effective immediately.

12.  Also in November, 2008, G.M. underwent two psychiatric evaluations conducted by Dr. Marianne Hendrix, M.D. and Dr. Michael Menella. In a report dated November 18, 2008, Dr. Hendrix opined that that G.M. was undergoing a major depressive episode. She further stated that until his condition improved, he would not be able to return to Brentwood High School; Sonderling High School Center and, rather, would benefit from a course of home tutoring. Similarly, in a report

dated November 28, 2008, Dr. Menella stated that G.M. suffered from anxiety and depressive symptoms and behavioral problems related to chronic stressors as a consequence of bullying and chronic mocking by his peers. He further stated that that G.M.'s reported stressors were chronic and not likely to subside. Defendant, District was provided with copies of both reports shortly after they were generated.

13.     Later in November, 2008, the District instituted a program of home tutoring which was, from its inception, was incomplete and insufficient to meet the District's obligation in that regard. Specifically, the home tutoring program never provided substitute instruction for the computer graphics and physical education classes G.M. was previously attending.

14.     On January 23, 2009, plaintiffs, JOHN M. and MICHELE M. were summoned to a meeting with school administrators including Ms. Pappert and the Assistant Superintendant for Secondary Education for the District, Dr. Joan Lange; who stated that the meeting had been called to determine an itinerary for resuming G.M.'s attendance at Brentwood High School. Plaintiffs, JOHN M. and MICHELE M. immediately objected, reiterating the concerns set forth above; i.e., that the hostile learning environment at the school had caused their son's injuries and that forcing him to return to that same environment posed an unreasonable and unacceptable risk of exposing him to further harm. At one point, plaintiff, MICHELE M. requested that, in light of her concerns for her son's safety, that he be transferred to another school in the District. Previously, plaintiff, MICHELE M. had made this request of Dr. Lange and had received no response. Dr. Lange now indicated that this request would not be granted at which point Ms. Pappert stated, in sum and substance, "If we were to do that for him, then we would have to do that for all the other white children who requested it."

15.     Previously, plaintiffs, JOHN M. and MICHELE M. had determined that the program of home tutoring provided by the defendants was insufficient to meet their son's educational needs. Among other things, the home tutoring program instituted in December, 2008 never provided substitute instruction for the computer graphics and physical education classes their son was previously attending. To this day, G.M has not been afforded an opportunity to make up the lost gym credit. In addition, G.M. missed significant periods of instruction in science when his teacher went out on maternity leave. G.M.'s instruction in mathematics was compromised by the fact that his teacher spoke English with a heavy accent. Because of a dispute regarding whether G.M would be required to take Regents examinations in history, mathematics and science at the high school, over his parents' objections, G.M. was not informed until literally the day of the examinations that he would be permitted to take these examinations at home, under observation by a proctor.

16.     In light of all of the concerns set forth above, i.e., insuring that their son was provided with a free appropriate public education in a safe environment, plaintiffs, JOHN M. and MICHELE M. decided to enroll G.M. in a private school; St. John the Baptist High School ("St. John the Baptist ") in West Islip. G.M attended St. John the Baptist for the 2009-2010 (11th Grade) and 2010-2011 (12th Grade) school years. Tuition and attendant costs to plaintiffs, JOHN M. and MICHELE M. resulting from their son's attendance at St. John the Baptist are anticipated to be approximately $20,000.00.

### a.     The First IDEA Due Process Complaint and Hearing

17.     On January 25, 2010, plaintiffs, JOHN M. and MICHELE M. filed a due process complaint with the District, in accordance with the IDEA; see, 20 U.S.C. § 1415(b)(6) and pursuant to §§ 200.5 (i) and (j) of the Regulations of the Commissioner of the Education Department (N.Y.

Comp. Codes R. & Regs. Tit. 8, § 200.5, et. seq.) ("Regulations of the Commissioner"). The due process complaint alleged that: G.M. was removed from Sonderling without due process; the homebound instruction program provided by the District was incomplete and insufficient to meet G.M.'s needs; G.M. suffered from anxiety and depressive symptoms and behavioral problems related to chronic stressors as a consequence of bullying and chronic mocking by his peers; and that since attending the St. John the Baptist G.M.'s overall situation had improved because the school presented a supportive environment which addressed G.M.'s emotional and psychological issues. Pursuant to the due process complaint, plaintiffs, JOHN M. and MICHELE M. sought reimbursement for tuition and related expenses for G.M.s 2009-10 (11th grade) and 2010-11 (12th grade) school years at St. John the Baptist.

18.     Thereafter, a due process hearing was commenced before Impartial Hearing Officer, Diane Cohen. The District presented its case over the course of two hearings held on June 11 and 16, 2010. Plaintiffs, JOHN M. and MICHELE M. presented their case at ensuing hearings held on June 29, August 16, September 10 and September 27, 2010.

19.     At the due process hearing, the preponderance of the evidence demonstrated the following;

20.     In the fall of 2008, petitioner G.M was attending school in the 10th grade at Sonderling. (District Ex. "2")[1] After the school year began, plaintiffs, JOHN M. and MICHELE M. informed Linda Pappert, a vice-principal at Sonderling, that G.M. was the victim of an ongoing pattern of bullying and harassment by other students at the school apparently targeted at his race.

---

1 Parenthetical references to "Joint", "District" or "Parents" followed by "Ex." and a letter or Arabic numerals are to the corresponding exhibits introduced into evidence at the hearing convened in response to the service of the first due process complaint.

Specifically, plaintiff, MICHELE M. advised Pappert that during the first week of school a group of African-American and Hispanic female students directed racial slurs at G.M during lunch; culminating with one of them striking him in the back with a chair. (343-344).[2] She also told Pappert about an incident where a black male student spit on G.M and uttered a racial epithet. (344).

21.     Male black students would accost G.M on a regular basis calling him, "cracker", "white boy" and "asshole". (345). On one occasion G.M. was talking to one of his biology teacher, Miss Shea, when a black male student pushed him and called him "cracker". (346, 401). On another occasion, a black male student spat on him. (401).

22.     The harassment culminated in an incident which took place on November 5th, the day after Election Day in 2008 ("the November incident"). On that day, G.M. accidently bumped into a black male student who began screaming racial epithets at him. (347). G.M. was quickly surrounded by a group of black, male students who began to threaten him while holding their hands inside hooded sweatshirts. (72, 348).

23.     Following this last incident, G.M. became depressed and emotionally despondent. (id.) He began to have trouble sleeping, had nightmares and would often come home from school upset. (351). He appeared to his mother to be lethargic. (id.)

24.     On November 10, 2010, G.M spoke to a guidance counselor, Jessica Rodriguez after Miss Shea informed school personnel that he was exhibiting antisocial behavior. G.M told Rodriguez that that he did not associate with people in his class and isolated himself. (Parents' Ex. "B") (209). Earlier in the school year, Coretta Okerblum, G.M.'s math teacher, had mentioned to Rodriguez that G.M was socially awkward and isolating himself. (216). Rodriguez then spoke to Ms. Legler; G.M.'s

---

2 Parenthetical references containing only Arabic numerals are to the pages of the hearing transcript.

guidance counselor during the previous school year who confirmed that G.M. was intelligent but socially awkward. (216). After the November incident, plaintiff, MICHELE M. spoke with Rodriguez and communicated her concern that her son was deteriorating, that his supporting network of friends was gone and that he was being harassed and bullied on a regular basis. (350). Plaintiff, MICHELE M. was also concerned about her son's academic performance. Although he performed well in the beginning of the school year, after the November incident, in addition to appearing lethargic, he seemed to stop or give up his academic efforts. (350-351).

25.    Earlier that same year, plaintiff, MICHELE M. spoke to Keren Adaki, the school psychologist and expressed her concern regarding a bullying incident that had taken place the previous year. (60). G.M.'s academic performance that previous year was at best minimally adequate. Out of 7 final grades; four were in the range of 60-66 with the remaining two, a 79 and 76. (Parent's Exhibit "A"). Adaki met with G.M whom she perceived as pleasant but socially insecure. (61). Adaki met with G.M. three or four times before November in an effort to engage him in various activities at the school. (61, 68). On one occasion, G.M. told Adaki that he felt he did not fit in at Sonderling because he was not black or Hispanic. (61-62).

26.    Thereafter, in November, G.M. was questioned by Adaki and David Goldfarb, a social worker employed by the District about reports from his teachers that he was acting in an irritable manner. (70). G.M.'s mother was called to the school that same day and met with Pappert, Adaki and Goldfarb. (354). They recommended to plaintiff, MICHELE M. that her son be immediately removed from school and that he undergo a psychiatric evaluation to assess his level of functioning. (District Ex. "3") (76, 354). They told her that G.M. was creating an unsafe environment for himself because he was reacting to the racial slurs, was fighting back and was emotionally

unstable. (355). Goldfarb told plaintiff, MICHELE M. "Well, he can't come back to school without an evaluation by a psychiatrist". (355). When plaintiff, MICHELE M. questioned the need for psychiatric medication in lieu of therapy, Goldfarb and Adaki insisted that he would be unable to get better on his own. (355, 356). Plaintiff, MICHELE M. also resisted the recommendation that her son be removed from school because of her concern that the resulting isolation would only exacerbate his condition. (357). Goldfarb responded by telling plaintiff, MICHELE M. "He's created a very dangerous situation for himself, and as a parent it's up to you if you want to leave him in a dangerous situation because I feel that his safety is at risk." (357). At that point, in view of the risks articulated about her son's safety, plaintiff, MICHELE M. felt she had no choice but to remove G.M. from school. (id.)

27.    After G.M.'s removal from school in mid-November, the District instituted a program of intermittent home tutoring which did not coalesce into a standardized program until the week after the Christmas holiday. (371).

28.    In accordance with the District's recommendation, plaintiff, MICHELE M. had G.M. evaluated by a psychiatrist, Marianne Hendrix. Dr. Hendrix diagnosed a paranoid episode and major depressive disorder. She noted, "Until improved, he cannot return to school and would benefit from home-tutoring for his own safety as well as his co-students and to improve his mental health." (District Ex. 6). These findings were discussed with Goldfarb and Rodriguez on the morning of November 18, 2010. (id.).

29.    Plaintiff, MICHELE M., sought a second opinion. In a report dated November 28, 2008, Dr. Michael Mennella stated that G.M. was suffering from anxiety and depressive symptoms and behavioral problems related to chronic stressors as a consequence of bullying and chronic

mocking by his peers. He further stated that that G.M.'s reported stressors were chronic and not likely to subside. (District Ex. "7"). The District was provided with a copy of this report as well. (District Ex. "2").

30.    On November 24, 2008, G.M. began treating with Jeanne Wolman; a licensed social worker. During her initial consultation, Wolman took a medical history noting G.M.'s apparent depression over ongoing racial behaviors directed at him since 9th grade. She noted G.M.'s complaints that he had been mistreated by black and Hispanic students. (Parents' Ex. "H"). She rendered an initial diagnosis of adjustment disorder with anxiety and depression. (601). She noted a global assessment function or "GAF" of 45; based, in large part, on his problems with, and isolation from, his peers at school. (602, 603). Ms. Wolman continued to treat with G.M. on a regular basis; seeing or speaking with him on approximately 49 occasions in the ensuing two years. (Parents' Ex. "H"). She was in agreement with Drs. Hendrix and Mennella that G.M. could not return to Sonderling; based on the lack of staff or a social network to support and protect him and the lack of peer relations. (618).

31.    In January, 2009, Pappert called plaintiff, MICHELE M. and told her that she wanted G.M. to return to Sonderling. (370-371). Pappert advised plaintiff, MICHELE M. of the District's intention despite the fact that the District had not had G.M evaluated since the Mennella evaluation in November. (374, 375). On or about January, 23rd plaintiff, MICHELE M. and her husband, plaintiff, JOHN M. attended a meeting with Pappert and Dr. Joan Lange; District Superintendent. Pappert stated that the purpose of the meeting was to discuss returning G.M. to school. (374). Plaintiff, MICHELE M. reminded Pappert that Dr. Mennella had stated that given that the chronic stressors he had identified were not likely to subside, G.M. should be removed from Sonderling. (id.)

Plaintiff, MICHELE M. told Pappert that she was afraid for her son and that G.M. would not be returning to Sonderling. (id.) She told Pappert that she thought the purpose of the meeting was to discuss placing G.M. in another school. Lange responded, "That's not going to happen". (id.) When plaintiff, MICHELE M. inquired why, Pappert responded; "If we did that for G., we'd have to do it for every white child and we can't do that". (375-376).

      32.     In the ensuing months additional issues arose with regard to G.M's home tutoring. His science tutor became pregnant and missed a lot of sessions. (377). He had a hard time understanding his math teacher because of her thick accent and a speech impediment. (id.) G.M. took three Regents examination at the end of the 2008-2009 school year; in Geometry, Living Environment and Global History – but was not advised of who his proctor was going to be -- or, on two occasions, when the examination was to be administered -- until the morning of the test. (District Ex. "11"); (377, 380).[3] Perhaps not surprisingly, he failed the Geometry examination. (Parents Ex. "C"). G.M also received a failing mark for the school year in Physical Education because the District was unable to provide an alternative program. (Parents Ex. "C") (District Ex. "11") (378). Similarly, G.M. lost credits for a computer graphics class the District was unable to replace when the home tutoring was instituted. (District Ex. "10") (378).

      33.     Sometime after being informed at the January, 2009 meeting that the District would not place him in another school, G.M.'s parents decided to enroll him in St. John the Baptist for the 2009-2010 school year. Consequently, plaintiffs, MICHELE M. and JOHN M. incurred approximately $9,300.00 in tuition and related school costs for that school year. (District Ex. "1") (389) (Parents Ex. "E"). G.M continued at St. John the Baptist for the 2010-2011 school year for

---

3 With regard to the third examination, G.M. was advised of when it was going to be given the day before the test.

which his parents were billed for tuition and related costs in approximately the same amount as for 2009-2010. (389).

34.     Following his initial enrollment at St. John the Baptist, G.M. underwent a period of some adjustment but ultimately, displayed a positive mood; much improved in comparison to the anxiety he displayed while he was at Sonderling. (759). At St. John the Baptist, G.M was able to enter into good relationships with his teachers and guidance counselor and has exhibited social involvement with his peers. (id.). When a verbal altercation took place with a football player at St. John the Baptist, G.M. came forward and disclosed the incident to the Dean. (613). Later, G.M would emphasize to his counselor, Jeanne Wolman, the support he perceived to be the norm at St. John where rules against fighting and violent behavior were strictly enforced, in contrast to Sonderling where he felt himself at risk due to his minority ethnicity, the absence of any network of social contacts and the lack of any support from the school staff. (613, 618, 757).

### b.     The First Impartial Hearing Officer's Decision

35.     Pursuant to the written Findings of Fact and Decision, dated November 23, 2010,[4] impartial hearing officer, Diane Cohen, determined that: she had subject matter jurisdiction over the case; that G.M should have been referred to the District's Committee on Special Education ("CSE"); that the District  failed to discharge its obligation to identify, locate and evaluate G.M as a child suspected of being a student with a disability who thereby may be in need of special education and related services, but for whom no determination of eligibility as a student with a disability had been made ("child find" obligation); the evidence contained in the hearing record established that G.M had maintained inappropriate feelings under normal circumstances and a generally pervasive mood

---

4 Hereinafter referred to as, "First IHO Decision".

of unhappiness or depression for a sufficient length of time to qualify as a student with an emotional disturbance and was thus "disabled" within the meaning of the IDEA; the unilateral placement by plaintiffs, MICHELE M. and JOHN M. of G.M . at St. John the Baptist was reasonable; equitable considerations favored the parents; and the parents were entitled to reimbursement for G.M.'s tuition and expenses at St. John the Baptist for the 2009-10 school year (First IHO Decision at pp. 15, 17-21). As for the 2010-11 school year, the impartial hearing officer denied the parents' request for tuition reimbursement as premature (id. at p. 22).

### c.    The First State Review Officer's Decision

36.    By Notice with Petition and Verified Petition, dated December 28, 2010, the District appealed the First IHO Decision to a New York State Education Department, State Review Officer. Plaintiffs, MICHELE M. and JOHN M. submitted a timely Answer and Cross-Appeal.

37.    In a Decision dated March 28, 2011, in Case No. 10-129, a copy of which is attached as Exhibit A" and incorporated in its entirety as if fully set forth herein,[5] State Review Officer ("SRO"), Justyn P. Bates determined that since the District did not submit a written challenge to the sufficiency of the due process complaint notice to the impartial hearing officer and the parents within the prescribed timelines as provided for under state and federal regulations, the January 25, 2010 due process complaint notice was deemed sufficient and the impartial hearing officer became obligated to convene the impartial hearing. (First SRO Decision, p.8). She further found that even if the District had timely challenged the due process complaint notice as insufficient, there is a strong likelihood that the due process complaint notice was nevertheless sufficient to continue to confer

---

5 Hereinafter referred to as "First SRO Decision".

jurisdiction upon the impartial hearing officer to proceed with the impartial hearing process and issue a decision. (First SRO Decision, p.9).

38.     The SRO further found that the District did not meet its burden of proof to show that it complied with its "child find" obligation. (First SRO Decision, p.10). Specifically, the SRO noted that that although the District did not impose a formal disciplinary suspension upon G.M. in the aftermath of the November 5, 2008 incident, it did consider G.M's behavior to constitute sufficient cause to remove him from the school premises, order a psychiatric evaluation, and change his educational placement from a general education classroom to homebound instruction; actions which, according to the SRO, "strongly suggests that the district had reason to suspect that the student may have had a disability and may need special education, thereby triggering its obligation to refer the student for evaluation by the CSE".[6] (First SRO Decision, p.12). Further, the SRO found that the content of the evaluative reports received by the District prior to its implementation of homebound instruction identified G.M.'s social/behavioral concerns sufficiently to warrant referral to the CSE. (id.).

39.     On a separate note, The SRO determined that plaintiffs, MICHELE M. and JOHN M. did not allege in either their due process complaint or in their cross-appeal that the incidents of bullying referenced in the hearing record did not deprive G.M of a "free appropriate public education." ("FAPE") within the meaning of 20 U.S.C. § 1401(9) and 34 C.F.R. § 300.17 and that even if plaintiffs, MICHELE M. and JOHN M. had advanced such an argument, the hearing record did not support such an allegation. (First SRO Decision, p.13, n. 17).

---

6 Committee on Special Education.

40. Having determined that the District violated it's "child find" obligation, the SRO, nevertheless determined that plaintiffs, MICHELE M. and JOHN M. did not meet their burden to demonstrate how the program provided at St. John the Baptist was specially designed to meet G.M.'s unique needs for the 2009-10 school year, and that consequently, they were not entitled to tuition reimbursement. (First SRO Decision, p.14). Specifically, the SRO cited a purported paucity of evidence in the hearing record describing G.M's educational program at St. John the Baptist. Having decided that plaintiffs, MICHELE M. and JOHN M. failed to meet this criterion for an award of tuition reimbursement, the SRO did not reach the issue of whether equitable considerations supported their claim. (First SRO Decision, p.15).

41. With regard to so much of plaintiffs, MICHELE M. and JOHN M.'s cross-appeal as challenged the determination of the impartial hearing officer to dismiss their claim for tuition reimbursement for the 2010-2011 school year at St. John the Baptist, the SRO concurred with the impartial hearing officer and dismissed the claim as premature. (First SRO Decision, p.16). Specifically, the SRO found that at the time the first due process complaint was filed in January 2010, there had been no CSE evaluation to determine whether G.M. was eligible for special education and related services for the 2010-11 school year, and hence, there was no way for either the impartial hearing officer or the SRO to know whether the CSE, if presented with such a referral would recommend that the student be eligible for special education as a student with a disability for the 2010-11 school year and, if so, what type of special education program and services the CSE may have recommended for the 2010-11 school year. (id.).

### d. The Second IDEA Due Process Complaint

42. On November 15, 2010, plaintiffs, JOHN M. and MICHELE M. filed a second due

process IDEA complaint with the District. That due process complaint alleged, among other things, that: (1) G.M. was removed from the district high school at the insistence of the District in mid-November 2008 without due process; (2) the homebound instruction program provided by the District was incomplete and insufficient to meet G.M.'s needs; (3) a psychiatrist found that G.M. suffered from anxiety and depressive symptoms and behavioral problems related to chronic stressors as a consequence of bullying and chronic mocking by his peers; (4) after receiving the results of two psychiatric evaluations of the student in late November 2008, the District had reason to suspect that G.M. had an emotional disturbance as defined in State and federal regulations, yet the district failed to refer him to the CSE for an initial evaluation; and (5) that St. John the Baptist was an appropriate placement for G.M., insofar as G.M. displayed a positive mood and was able to enter into good relationships with his teachers and guidance counselor and exhibited social involvement with his peers. Plaintiffs, JOHN M. and MICHELE M. sought an order from an impartial hearing officer awarding reimbursement for all costs and expenditures incurred as a result of having to enroll G.M. in St. John the Baptist or alternatively, directing the District to refer G.M. to the CSE for evaluation of his eligibility to receive special education and related services as a student with a disability. Plaintiffs, JOHN M. and MICHELE M. sought reimbursement for tuition and related expenses for G.M.'s 2009-10 (eleventh grade) and 2010-11 (twelfth grade) school years at St. John the Baptist.

### e.    The Second Impartial Hearing Officer's Decision

43.    Following a prehearing conference, the District moved to dismiss the second due process complaint based on *res judicata*; alleging that the issues raised therein had already been decided in the First IHO Decision.

44.    Plaintiffs, JOHN M. and MICHELE M. opposed the motion; initially, on the

grounds that the District's application was untimely pursuant to § 200.5 (i) (3) of the Regulations

of the Commissioner. They further argued that the District's reliance on *res judicata* and

*collateral estoppel* was misplaced since those doctrines operate to preclude relitagation of claims

and issues, respectively, which were the subject of a final determination on the merits. By

operation of law, the District's (at the time) undecided administrative appeal of the decision of

the First IHO Decision divested that determination of the necessary finality to invoke either claim

or issue preclusion. Plaintiffs, JOHN M. and MICHELE M. further argued that should the SRO

in the appeal of the First IHO Decision determine that the impartial hearing officer lacked subject

matter jurisdiction, *res judicata* would be unavailable to respondent since such a determination

would not constitute a final determination on the merits.

45.     Finally, Plaintiffs, JOHN M. and MICHELE M. established that, far from

constituting a repetitious attempt to obtain the same relief sought in the first due process

complaint, their filing of the second due process complaint was undertaken directly in response

to the District's contention, in their appeal of the First IHO Decision, that the impartial hearing

officer in that case erred when she determined that she had subject matter jurisdiction over the

case. As noted by Plaintiffs, JOHN M. and MICHELE M., in the event the District (1) prevailed

on that issue in its appeal and (2) obtained a dismissal of the second due process complaint,

Plaintiffs, JOHN M. and MICHELE M.'s recourse would be to file another due process

complaint. However, at that juncture, the District could be reasonably expected to raise, as a

defense, the two-year statute of limitations set forth in § 200.5 (i) (1) (i) (3) of the Regulations of

the Commissioner. The end result would be that plaintiffs might be left without a forum to have

their claim heard on the merits despite that fact that the second due process complaint was timely served.

46.    In an undated decision,[7] impartial hearing officer, Theodore DeBowy determined that all of the remedies sought in the second due process complaint had been addressed in the First IHO Decision. Consequently, he dismissed the second due process complaint on the grounds of *res judicata*.

   f. **The Second State Review Officer's Decision**

47.    By Notice with Petition and Verified Petition, dated February 22, 2011, plaintiffs, JOHN M. and MICHELE M. appealed the Second IHO Decision to a New York State Education Department, State Review Officer. The District answered but did not cross-appeal.

48.    In a Decision dated April 19, 2011, in Case No. 11-023, a copy of which is attached as Exhibit "B" and incorporated in its entirety as if fully set forth herein,[8] State Review Officer ("SRO"), Justyn P. Bates determined that with respect to G.M.s 2009-10 school year at the St. John the Baptist, Plaintiffs, JOHN M. and MICHELE M .'s claim was precluded on the basis of *res judicata*. (Second SRO Decision, p.5). In so holding, the SRO rejected plaintiffs, JOHN M. and MICHELE M.'s claim that the impartial hearing officer was required to conduct a hearing because the District failed to challenge the sufficiency of the second due process complaint in a timely manner. The Second SRO Decision did not address plaintiffs', JOHN M. and MICHELE M.'s argument that the District was precluded from invoking *res judicata*, in view of their attempt to

---

7 Hereinafter referred to as, "Second IHO Decision".

8 Hereinafter referred to as "Second SRO Decision".

invoke, on their appeal of the First IHI Decision, a lack of subject matter jurisdiction as a ground for annulling that decision.

49.     With regard to the claim for tuition reimbursement for the 2010-11 school year at St. John the Baptist, the SRO noted that in the First IHO Decision the impartial hearing officer declined to consider the merits of the 2010-11 claim on the ground that the claim was premature. In contrast, the SRO found that the tuition reimbursement claim for the 2010-11 school year was a live controversy that had become ripe for adjudication given that plaintiffs, JOHN M. and MICHELE M. had filed the second due process complaint in November 2010. (Second SRO Decision, p.5). Furthermore, the SRO found *res judicata* to be inapplicable to the tuition reimbursement claim for the 2010-11 school year because no final decision on the merits of that particular claim was reached in the First IHO Decision. (Second SRO Decision, p.6).

50.     Accordingly, in light of the foregoing, the SRO found that the dismissal of plaintiffs, JOHN M. and MICHELE M.'s claim for tuition reimbursement for the 2010-11 school year was improper, and annulled that portion of the Second IHO Decision and remanded the proceeding to the impartial hearing officer with a direction to convene a new impartial hearing on the issue of plaintiffs, JOHN M. and MICHELE M.'s claim.

g.     **The Hearing on Remand and the Third Impartial Hearing Officer's Decision**

51.     On remand, the District called as its sole witness, Victoria Regan; the District's Director of Special Services. Ms. Regan testified, in sum and substance, that none of the evidence she encountered while attending the hearing on the First Due Process complaint led her to conclude that G.M. warranted an evaluation to determine whether he required special

education services for the 2010-2011 school year. (159)[9] In support of her conclusion she cited excerpts from the testimony of Jean Wolman at the First Due Process hearing that while at St. John the Baptist in 2009-2010, G.M. maintained a good academic standing (143) and developed positive relationships with his teachers. (148). She conceded that it was Ms. Wolman's opinion that much of the improvement was attributable to the fact that G.M. was no longer dealing with the stressors at Sonderling. (154).

52.     Ms. Regan testified that in response to a phone call from plaintiff, MICHELE M. after the IHO's decision on the First Due Process complaint in which she indicated G.M. was still having problems, she advised plaintiff MICHELE M. that if she wanted G.M. to be evaluated she could contact the West Islip school district (hereinafter, "West Islip") or SJB. (160-164).

53.     On cross-examination, Ms. Regan conceded that at the First Due Process Hearing, the hearing officer had stated that in order for G.M. to be afforded a FAPE he had to be given a placement other than Sonderling. (221). She testified that she had no information from which she could identify Sonderling as an inappropriate placement other than the stressors identified by Ms. Wolman. (252). With regard to the State Education Department memorandum, "Guidance on Parentally Placed Nonpublic Elementary and Secondary School Students with Disabilities... ("SED Memorandum") (District Ex. "G"),[10] Ms. Regan conceded that for a district of residence to be relieved of its obligation to provide FAPE, at a minimum, the district of location must have determined, through "child find", that a child needs special education and related services. (256). Finally, she conceded that had the District convened its CSE prior to the 2010-2011 school year

9 Parenthetical references in subsection (g) of this Complaint containing only Arabic numerals are to the pages of the transcript of the hearing on remand.

10 Parenthetical references in subsection (g) of this Complaint to "District" or "Parents" followed by "Ex." and a

and provided special education services; in the event plaintiffs, JOHN M. and MICHELE M.

unilaterally placed G.M. in St. John the Baptist the obligation to provide FAPE would still be

with the District as the district of residence. (260). In response to a question from the Hearing

Officer, Ms. Regan conceded that the District never sent plaintiffs, JOHN M. and MICHELE M.

the sample notice letter attached to the SED Memorandum as Attachment 3. (263).

54.     Plaintiffs, JOHN M. and MICHELE M.'s first witness, plaintiff, MICHELE M.

testified that the District never asked for her consent to forward information to West Islip. (280).

She testified that following the end of the 2009-2010 school year, no one from the District

contacted her about where G.M. should attend school in 2010-2011. (id.) She testified that she

initially asked for a transfer into another school within the District at the January, 2009 meeting.

(281). She never told anyone at the District that she would not accept a transfer to another school

within the District. (282).

55.     She testified that following the commencement of the 2010-2011 school year, she

had in excess of ten (10) conversations with G.M.'s guidance counselor at St. John the Baptist;

Kevin Carbonetti. (287). She testified that during the conversation testified to by Victoria Regan

she was told that if she wanted an evaluation it would have to go through West Islip. (283). She

testified that when she raised the issue of an evaluation with Mr. Carbonetti, he dissuaded her

from following through and told her that at that point in the academic year it might have a

negative effect on G.M. emotionally and could impact his grades. (288-289). She testified that

following G.M.'s interaction with Mr. Carbonetti, he became more social outside of school and

eventually was able to discontinue therapy with Jean Wolman. (289-290). She testified that

---

letter or Arabic numerals are to the corresponding exhibits introduced into evidence at the hearing on remand.

during the 2010-2011 school year Mr. Carbonetti initially tried to get G.M. to socialize more at

St. John the Baptist, however, when it became apparent that he was apprehensive about that

prospect, the guidance counselor placed more emphasis on his academics and his relationships

outside of school. (290).

56.     Jean Wolman testified that although she did not see G.M for most of the 2010-

2011 school year, she spoke to plaintiff MICHELE M. on nine (9) occasions. She testified that in

her opinion, Sonderling would not have been an appropriate placement for the 2010-2011 school

year. In support of her opinion, she cited the fact that St. John the Baptist, in contrast, provided

the necessary level of safety and security to enable G.M. to deal with his trauma, social anxieties

and isolation and provided a regular support network characterized by his interaction with Mr.

Carbonetti. (388-389). By way of example, she referenced an incident with another student early

during G.M.s tenure at St. John the Baptist. She noted that St. John the Baptist called the student

to the Dean's office and the situation was promptly and effectively rectified. (391).

57.     Kevin Carbonetti, appearing in response to a subpoena, testified that he was

G.M.'s guidance counselor at St. John the Baptist during the 2010-2011 school year. During that

year he met with G.M. approximately ten (10) times and also spoke with plaintiff, MICHELE M.

(473, 477). He confirmed that he had learned that G.M. had made some very strong social

connections outside of school. (478). He testified that while he encouraged G.M. to socialize

with other students at St. John the Baptist he indicated that he preferred not to. (476).

58.     Mr. Carbonetti testified that the majority of the student body at St. John the

Baptist was Caucasian. (476). He stated that he was aware of one incident between G.M. and

another student which occurred while G.M. was a junior. (474). He testified that he was unaware

of any incidents during the 2010-2011 school year involving G.M. and another student (id.). In

fact, he testified that while employed at St. John the Baptist there occurred one (1) incident of

fighting he was aware of. (476). G.M. was not involved in the incident. (id.)

59.     In a decision dated October 18, 2011, the IHO ordered the District to pay

plaintiffs, JOHN M. and MICHELE M. tuition reimbursement in the amount of $9,995.00 for the

2010-2011 school year. The initial issue framed by the IHO was whether the petitioner denied

FAPE by failing to refer G.M. to its CSE; given the prior determinations that the District violated

its "child find" obligation by failing to initiate such a referral when confronted with the

circumstances at Sonderling in the fall of 2008. In reaching his determination, the IHO rejected

the District's contention that a State Education Department Memorandum providing for the filing

of due process complaints with the district of location where CSE findings are at issue relieved

the District of its FAPE obligation. In contrast, the IHO noted, the same memorandum noted that

where a parent seeks tuition reimbursement where FAPE is at issue, the due process complaint is

properly filed with the District of residence. The IHO also rejected the District's argument that

the guidance provided in response to Question 11 of the memorandum relieved it of its obligation

to provide FAPE. Specifically, the IHO found that the District failed to produce evidence

indicating that plaintiffs, JOHN M. and MICHELE M., upon an evaluation by the CSE, would

have rejected a proffered placement within the District of residence.

60.     Having determined that the due process complaint was properly filed in the District of

residence, the IHO further found that plaintiffs, JOHN M. and MICHELE M. had met their

obligation of demonstrating that St. John the Baptist was an appropriate alternative placement. In so

holding, the IHO found that G.M. was able to receive a general education at St. John the Baptist

without being subjected to the peer bullying which had taken place at Sonderling. The IHO also noted that the District failed to offer any placement other than a return to Sonderling.

### h.    The Third State Review Officer's Decision

61.     By Notice With Petition and Verified Petition, both dated November 22, 2011, the District sought review of the Third Impartial Hearing Officer Decision before the SRO. Plaintiffs, JOHN M. and MICHELE M. answered but did not cross-appeal.

62.     In a Decision dated January 23, 2012, in Case No. 11-153, a copy of which is attached as Exhibit "C" and incorporated in its entirety as if fully set forth herein,[11] State Review Officer ("SRO"), Justyn P. Bates sustained the District's appeal, in part. (Third  SRO Decision, p.1). Initially, the SRO rejected the District's argument that plaintiffs, JOHN M. and MICHELE M.'s November 15, 2010 due process complaint did not adequately allege that the District denied G.M. a FAPE for the 2010-2011 school year. In so holding, the SRO determined that the due process complaint alleged that plaintiffs, JOHN M. and MICHELE M. wanted an impartial hearing pursuant to State regulations regarding the evaluation and educational placement of a student suspected of having a disability and that they intended to seek reimbursement for their unilateral placement of G.M. at St. John the Baptist for the 2010-2011 school year. (Third SRO Decision, p.5).

63.     Next the SRO determined that the evidence of record supported the IHO's determination that the District violated it's "child find" obligation with regard to the 2010-2011 school year. Specifically, the SRO found that there was no evidence that the district of location of St. John the Baptist (West Islip Union Free School District) had already determined through the "child find" process that G.M. needed special education and related services; a necessary condition

---

11 Hereinafter referred to as "Third  SRO Decision".

precedent to displacing the District's obligation to evaluate G.M.; determine his eligibility for special education services and, if appropriate, develop an individualized education program ("IEP") for G.M. (Third SRO Decision, p.8). The SRO also rejected the District's contention that even assuming that the "child find" obligation did not exclusively rest with the district of location, the District's failure to evaluate G.M. for the 2010-2011 school year was excusable because it lacked a reasonable basis to suspect that G.M had a disability and was in need of special education programs and services. In contrast, the SRO found that the District possessed sufficient information which was examined in detail during a previous impartial hearing relating to the 2009-2010 school year and which identified G.M.'s social/behavioral concerns sufficiently to trigger the District's "child" find" obligation for the 2010-2011 school year. (Third SRO Decision, p.10).

64.      Having found that the District violated its "child find" obligation, the SRO, nevertheless determined that the hearing record was insufficiently developed to determine whether G.M. met any of the regulatory criteria to become eligible for special education programs and related services as a student with an emotional disturbance. The SRO acknowledged that G.M.s private therapist testified that the District's high school (Sonderling) was not an appropriate placement because G.M had been involved in a cycle of violence there with his peers; had been targeted and that Sonderling failed to provide the necessary sense of security, support and one-to-one contact that G.M. required. However, the SRO discounted the therapist's opinion on the basis that she lacked personal knowledge of the services to be provided to at Sonderling or with regard to G.M.s academic performance there and also because, in the SRO's view, her opinion on G.M.'s ability to succeed at St. John the Baptist as opposed to Sonderling was based on what plaintiff, MICHELE M. had told her. The SRO also criticized the IHO's reliance on *T.K. v. New York City Dep't of Educ.,* 779

F.Supp.2d 289 (E.D.N.Y 2011) as misplaced given that in that case, the student had already been evaluated by the Committee on Special Education and found to be a student with a disability and, thus, eligible for special education services. (Third SRO Decision, p.12).

65.    Finally, the SRO determined that, assuming that G.M. had been denied a FAPE for the 2010-2011 school year, plaintiffs, JOHN M. and MICHELE M. failed to meet their burden of demonstrating that St. John the Baptist was an appropriate alternative placement for G.M. for the 2010-2011 school year. (Third SRO Decision, p.14, 16). The SRO based this conclusion, in turn, on a purported "paucity of evidence describing [G.M.'s] educational program at [St. John the Baptist]. (Third SRO Decision, p.14). While acknowledging the IHO's finding that"[t]here was no evidence in this proceeding that this student needed any further special education accommodation except to be removed from the stressor of peer bullying which occurred in the district's high school" (Third SRO Decision, p.16; quoting IHO Decision at p. 2); the SRO, nonetheless, rejected the IHO's consequential finding that St. John the Baptist was an appropriate alternative placement; opining that "it [the removal] did not satisfy the parents' burden to demonstrate how the program provided at [St. John the Baptist] was specially designed to meet the student's unique needs for the 2010-11 school year...") (Third SRO Decision, p.16). Having determined that plaintiffs, JOHN M. and MICHELE M. did not meet the second criterion for an award of tuition reimbursement, the SRO did not reach the issue of whether equitable considerations supported the parents' claim. (id.)

### i.  Pending Litigation

66.    On July 28, 2011, plaintiffs commenced an action in this Court against defendants; styled, "JOHN M. Individually, and in his capacity as Parent of Giovanni M., a disabled student, MICHELE M., Individually, and in her capacity as Parent of Giovanni M. and GIOVANNI M.

against BRENTWOOD UNION FREE SCHOOL DISTRICT"; assigned Case No. CV- 11 3634 (JFB) (WDW). That action alleges four claims for which relief can be granted. The first two allege claims under the IDEA and seek to annual the First and Second SRO Decisions, respectively, and seek an award of reimbursement for all resulting tuition and related expenses arising out of G.M.s, attendance at St. John the Baptist High School in West Islip and an award of attorneys fees. The second and third allege claims the ADA and under Section 504 of the Rehabilitation Act, respectively. That action is currently pending.

67.     Previously, plaintiff's commenced against the District and individual defendants in the Supreme Court of the State of New York, County of Suffolk alleging state common law tort claims as well as New York state and federal statutory claims arising out of the incidents alleged above. Defendants removed that action to this Court where it in now pending under the style; "GIOVANNI M., an infant, by his parents, JOHN M. and MICHELE M. and JOHN M. and MICHELE M., on their own behalf against THOMAS O'BRIEN [et. al.]; assigned Case No. CV- 10 5484 (LDW) (WDW). Pursuant to a stipulation "so-ordered' by the Court on September 26, 2011, an amended complaint was filed which added a claim under the IDEA seeking to annul the First SRO Decision.

### AS AND FOR A FIRST CLAIM FOR WHICH RELIEF CAN BE GRANTED

68.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "67" with the same force and effect as though fully set forth herein.

69.     Pursuant to 20 U.S.C. § 1415; i.e., the Individuals with Disabilities Education Act ("IDEA"), defendants, at all times relevant herein, were obligated to provide plaintiff, G.M with a free appropriate public education ( "FAPE").

70.     At all times relevant herein, plaintiff, G.M was an emotionally disturbed student, within the meaning of N.Y. Comp. Codes R. & Regs. Tit. 8, § 200.1 (MM)(4) and 34 C.F.R § 300.7 (b)(9), in that G.M. was:

> A student with an inability to learn which cannot be explained by intellectual, sensory or health factors and/or who exhibited one or more of the following characteristics over a long period of time and to a marked degree:
>
> (i)     an inability to build or maintain satisfactory interpersonal relationships with peers and teachers;
>
> (ii)    inappropriate types of behavior or feelings under normal circumstances;
>
> (iii)   a generally pervasive mood of unhappiness or depression; or (iv) a tendency to develop physical symptoms or fears associated with personal or school problems.

71.     At all times relevant herein, plaintiff, G.M was a child with a "serious emotional disturbance" and, thus "disabled", within the meaning of 20 U.S.C. § 1401 (a) (1) (A) (i).

72.     So much of the Third SRO Decision which sets forth the following determinations is not supported by a preponderance of the evidence introduced at the hearing convened on remand pursuant to the Second SRO Decision; (1) that that the hearing record was insufficiently developed to determine whether G.M. met any of the regulatory criteria to become eligible for special education programs and related services for the 2010-2011 school year as a student with a "serious emotional disturbance" within the meaning of N.Y. Comp. Codes R. & Regs. Tit. 8, § 200.1 (MM)(4) and 34 C.F.R § 300.7 (b)(9); and (2) assuming that G.M. had been denied a FAPE for the 2010-2011 school year, that plaintiffs, JOHN M. and MICHELE M. failed to meet their burden of demonstrating that St. John the Baptist was an appropriate alternative placement for G.M. for the 2010-2011 school year.

73.     Contrary to the determination set forth in the Third SRO Decision, the hearing record, which included copies of the transcript and exhibits introduced at the First Due Process hearing, demonstrated, by a preponderance of the evidence, that during the 2010-2011 school year G.M. suffered from an "emotional disturbance" within the meaning of 34 C.F.R. § 300.8 (c) (4) and 8 NYCRR 200.1 (ZZ) (4). In addition, as noted above, the First IHO Decision included a finding that during the 2009-2010 school year G.M had maintained inappropriate feelings under normal circumstances and a generally pervasive mood of unhappiness or depression for a sufficient length of time to qualify as a student with "an emotional disturbance" and was thus "disabled" within the meaning of 34 C.F.R. § 300.8 (c) (4) and 8 NYCRR 200.1 (ZZ) (4). At the ensuing hearing on remand which culminated in the Third IHO Decision, none of the evidence offered by either party supported a finding that G.M.'s disability had either resolved or lessened in any significant respect. Rather, the evidence, including the testimony of plaintiff, MICHELE M. and S.M.'s therapist, Jean Wolman, confirmed that G.M. continued to be plagued by inappropriate feelings and general mood of unhappiness or depression as cited in the First IHO Decision. Moreover, to the extent these findings may have been mitigated to some degree during the 2010-2011 school year, it was clearly attributable, not to any material change in G.M.s underlying condition, but rather to the fact that, due to his removal from Sonderling and his alternative placement, he was no longer subject to the environmental stressors which triggered his emotional disturbance in the first instance.

74.     In addition, the SRO erred in determining that, assuming that G.M. had been denied a FAPE for the 2010-2011 school year, plaintiffs, JOHN M. and MICHELE M. failed to meet their burden of demonstrating that St. John the Baptist was an appropriate alternative

placement. Contrary to the SRO's finding, plaintiffs, JOHN M. and MICHELE M. met their burden with regard to this issue by demonstrating that the placement of G.M. at St. John the Baptist for the 2010-2011 school year was appropriate given that it afforded their son the best opportunity to continue his education in a general education setting which provided the least restrictive environment for his emotional disability. There is no basis in the law for the SRO's determination that reimbursement was further conditioned on a demonstration by plaintiffs, JOHN M. and MICHELE M. that St. John the Baptist, in addition to providing a least restrictive environment accommodation, also offered G.M. educational instruction more characteristic of traditional special education services.

75.    The actions of the District complained of were clearly inappropriate and insufficient to provide plaintiff, G.M. with a FAPE.

76.    Pursuant to 20 U.S.C. § 1415 (i) (2) (B), this action is brought within such time as New York state law allows.

77.    As a proximate result of defendants' actions, plaintiffs, JOHN M. and MICHELE M. are entitled to a judgment and order (1) annulling so much of the Third SRO Decision as is being challenged in this action; (2) directing the District to pay to plaintiffs, MICHELE M. and JOHN M. reimbursement for all resulting tuition and related expenses arising out of G.M.s, attendance at St. John the Baptist in West Islip for the 2010-2011 school year; and, (3) pursuant to 20 U.S.C. § 1415 (i) (2) (C) (3) (i) (I), awarding plaintiffs, JOHN M. and MICHELE M. reasonable attorneys fees as part of the costs of the action and compensatory and punitive damages.

**AS AND FOR A SECOND CLAIM FOR WHICH RELIEF CAN BE GRANTED**

78.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "77" with the same force and effect as though fully set forth herein.

79.     Title II of the Americans with Disabilities Act (hereinafter "ADA") provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

80.     As is demonstrated above, the District discriminated against plaintiff, G.M., as a qualified individual with a disability, by denying him the benefits, programs and services of the DISTRICT; giving rise to liability under 42 U.S.C. § 12132.

81.     As is demonstrated above, at all times relevant herein, (1) G.M. was a "qualified individual with a disability"; (2) the District was subject to the ADA; and (3) G.M. was denied the opportunity to participate in or benefit from defendant's services, programs, or activities, or was otherwise discriminated against by defendant, by reason of his disability.

82.     The discriminatory behavior by the District complained of included, but is not limited to, (1) the DISTRICT's insistence, in January, 2009, that G.M return to Sonderling or, in lieu of that placement, undergo home tutoring and (2) the District's failure to discharge it's "child find" obligation with regard to the 2010-2011 school year, as confirmed in the Third SRO Decision and (2) its refusal, as upheld in the First SRO Decision, Second SRO Decision and Third SRO Decision, to reimburse plaintiffs, JOHN M. and MICHELE M. for tuition and related costs incurred as a result of having to enroll G.M. at St. John the Baptist for the 2008-2009 and 2010-2011 school years.

83.     By engaging in the discriminatory behavior set forth above, defendant, District failed to offer a reasonable accommodation to provide plaintiff, G.M. with meaningful access to a service

previously provided by the District; i.e., a free appropriate public education ("FAPE").

84.    The actions of the District complained of were not only clearly inappropriate and insufficient to provide plaintiff, G.M. with a FAPE, but was also undertaken in bad faith or as a result of gross misjudgment, for which defendant, District is liable to plaintiff under the ADA.

**AS AND FOR A THIRD CLAIM FOR WHICH RELIEF CAN BE GRANTED**

85.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "84" with the same force and effect as though fully set forth herein.

86.    Section 504 of the Rehabilitation Act, provides: "No otherwise qualified individual with a disability in the United States...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. § 794(a).

87.    At all times relevant herein, the District has been a recipient of Federal financial assistance.

88.    As is demonstrated above, the District discriminated against plaintiff, G.M., as a qualified individual with a disability, by denying him the benefits, programs and services of the District; giving rise to liability under 29 U.S.C. § 794(a).

89.    As is demonstrated above, at all times relevant herein, (1) G.M. was a "qualified individual with a disability"; (2) the District was subject to the Section 504 of the Rehabilitation Act; and (3) G.M. was denied the opportunity to participate in or benefit from defendant's services, programs, or activities, or was otherwise discriminated against by defendant, by reason of his disability.

90.    The discriminatory behavior by the District complained of included, but is not limited

to, (1) the DISTRICT's insistence, in January, 2009, that G.M return to Sonderling or, in lieu of that placement, undergo home tutoring and (2) the District's failure to discharge it's "child find" obligation with regard to the 2010-2011 school year, as confirmed in the Third SRO Decision and (2) its refusal, as upheld in the First SRO Decision, Second SRO Decision and Third SRO Decision, to reimburse plaintiffs, JOHN M. and MICHELE M. for tuition and related costs incurred as a result of having to enroll G.M. at St. John the Baptist for the 2008-2009 and 2010-2011 school years.

91. By engaging in the discriminatory behavior set forth above, defendant, District failed to offer a reasonable accommodation to provide plaintiff, G.M. with meaningful access to a service previously provided by the District; i.e., a free appropriate public education ("FAPE").

92. The actions of the District complained of were not only clearly inappropriate and insufficient to provide plaintiff, G.M. with a FAPE, but was also undertaken in bad faith or as a result of gross misjudgment, for which defendant, District is liable to plaintiff under Section 504 of the Rehabilitation Act.

WHEREFORE, plaintiffs, demands judgment as follows:

A. On the First Claim for Which Relief Can be Granted, (1) annulling so much of the Third SRO Decision as is being challenged in this action; (2) directing defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT to pay to plaintiffs, MICHELE M. and JOHN M. reimbursement for all resulting tuition and related expenses arising out of G.M.s, attendance at St. John the Baptist High School in West Islip for the 2010-2011 school year; and, (3) pursuant to 20 U.S.C. § 1415 (i) (2) (C) (3) (i) (I), awarding plaintiffs, JOHN M. and MICHELE M. reasonable attorneys fees as part of the costs of the action and directing that defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT be ordered to pay compensatory damages in the amount of Fifty Million ($50,000,000.00) Dollars and punitive damages in an amount to be determined at trial; as well as all additional legal and equitable relief to which plaintiffs may be additionally entitled;

B. On the Second Claim for Which Relief Can be Granted, (1) annulling so much of the First SRO Decision as is being challenged in this action; (2) annulling so much of the Second SRO Decision as is being challenged in this action; (3) annulling so much of the

Third SRO Decision as is being challenged in this action; (4) directing defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT and the impartial hearing officer to convene a hearing with regard to the second due process complaint or, alternatively, directing defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT and the impartial hearing officer to stay the hearing of the second due process complaint pending a final determination of defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT's defense that the impartial hearing officer lacked subject matter jurisdiction to convene a hearing with regard to the first due process complaint; (5) directing defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT to pay to plaintiffs, MICHELE M. and JOHN M. reimbursement for all resulting tuition and related expenses arising out of G.M.s, attendance at St. John the Baptist High School in West Islip; and awarding plaintiffs, JOHN M. and MICHELE M. reasonable attorneys fees as part of the costs of the action and directing that defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT be ordered to pay compensatory damages in the amount of Fifty Million ($50,000,000.00) Dollars and punitive damages in an amount to be determined at trial; as well as all additional legal and equitable relief to which plaintiffs may be additionally entitled;

C. On the Third Claim for Which Relief Can be Granted, (1) annulling so much of the First SRO Decision as is being challenged in this action; (2) annulling so much of the Second SRO Decision as is being challenged in this action; (3) annulling so much of the Third SRO Decision as is being challenged in this action; (4) directing defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT and the impartial hearing officer to convene a hearing with regard to the second due process complaint or, alternatively, directing defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT and the impartial hearing officer to stay the hearing of the second due process complaint pending a final determination of defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT's defense that the impartial hearing officer lacked subject matter jurisdiction to convene a hearing with regard to the first due process complaint; (5) directing defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT to pay to plaintiffs, MICHELE M. and JOHN M. reimbursement for all resulting tuition and related expenses arising out of G.M.s, attendance at St. John the Baptist High School in West Islip; and awarding plaintiffs, JOHN M. and MICHELE M. reasonable attorneys fees as part of the costs of the action and directing that defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT be ordered to pay compensatory damages in the amount of Fifty Million ($50,000,000.00) Dollars and punitive damages in an amount to be determined at trial; as well as all additional legal and equitable relief to which plaintiffs may be additionally entitled;

F. That defendant, BRENTWOOD UNION FREE SCHOOL DISTRICT be ordered to pay to plaintiffs punitive damages in an amount to be determined at trial, to punish defendants for their willful and malicious misconduct and as may be deemed by the court to be necessary to deter defendant from engaging in such misconduct in the future.

G. For such additional, equitable and legal relief as the court may deem just and proper.

H. For the costs and expenses of this action;

I. For reasonable attorney's fees; and

J. For such other and further relief as to this Court may seem just and proper.

Dated: Smithtown, New York
      May 23, 2012                  Yours, etc.

                             LAW OFFICES OF WAYNE J. SCHAEFER, LLC

                             Wayne J. Schaefer, (WS1129)
                               as Member
                             *Attorneys for Plaintiffs, JOHN M., Individually, and*
                             *in his capacity as Parent of Giovanni M., a*
                             *Disabled Student, MICHELE M., Individually, and*
                             *in her capacity as Parent of Giovanni M., a*
                             *Disabled Student, and GIOVANNI M.*
                             199 East Main Street, Suite 4
                             Smithtown, New York 11787
                             Tel.: (631) 382-4800

**Exhibit A**



# The University of the State of New York

## The State Education Department
### State Review Officer
#### www.sro.nysed.gov

No. 10-129

**Application of the BOARD OF EDUCATION OF THE BRENTWOOD UNION FREE SCHOOL DISTRICT for review of a determination of a hearing officer relating to the provision of educational services to a student suspected of having a disability**

**Appearances:**

Ingerman Smith, LLP, attorneys for petitioner, Edward H. McCarthy, Esq., of counsel

Law Offices of Wayne J. Schaefer, LLC, attorneys for respondents, Wayne J. Schaefer, Esq., of counsel

## DECISION

Petitioner (the district) appeals from the decision of an impartial hearing officer which found that it failed to offer an appropriate educational program to respondents' (the parents') son and ordered it to reimburse the parents for their son's tuition at a non-public private high school (NPS) for the 2009-10 school year. The parents cross-appeal from the impartial hearing officer's determination which denied their request for reimbursement for their son's tuition at the NPS for the 2010-11 school year. The appeal must be sustained. The cross-appeal must be dismissed.

According to the hearing record, the student received diagnoses of an adjustment disorder with mixed disturbance and emotional conduct, anxiety, depression, a post-traumatic stress disorder (PTSD), a depressive disorder, not otherwise specified (NOS), and behavioral problems secondary to reported peer bullying (Tr. pp. 85, 361-63, 368-70, 615-16, 666-67, 674-79, 684, 752-54; Dist. Exs. 1 at p. 3; 6 at p. 1; 7; Parent Exs. H at pp. 13, 15-19, 21-24, 29, 32; I; see Tr. pp. 103-05). The NPS has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7). The student's eligibility for special education and related services as a student with an emotional disturbance is in dispute in this appeal (see 34 C.F.R. § 300.8[c][4][i]; 8 NYCRR 200.1[zz][4]).

**Background**

      The hearing record is sparse relative to the student's educational background.  It reflects that the student was educated in a general education setting in district schools from kindergarten (1998-99) through tenth grade (2008-09) (Dist. Ex. 7 at p. 2).  The hearing record contains references that the student reported bullying incidents by peers as early as fifth grade and continuing into sixth grade, and that the student "began to act out some of his aggression" in sixth grade (Dist. Ex. 7 at p. 1; Parent Ex. H at pp. 6, 21).[1]  According to the hearing record, during sixth grade the student was treated by a psychiatrist and received medication for "anxiety symptoms and behavioral problems related to his reports of being bullied by others" for an indeterminate time period, "[h]e then improved and [the medication] was discontinued;" he also received counseling for an unspecified time period (Dist. Ex. 7 at p. 2; see Dist. Ex. 4).[2]  The hearing record reflects that in December 2005, during seventh grade, the student witnessed an automobile accident in which his mother and brother were injured (Dist. Ex. 7 at p. 2; see Tr. pp. 212, 638-39; Dist. Ex. 5; Parent Ex. H at pp. 22-23).

      On July 7, 2008, the district issued the student's report card for the 2007-08 school year (ninth grade) (Parent Ex. A).[3]  The report card reflects that the student earned the following grades: 76 in English; 79 in Global Study; 65 in Algebra; 65 in Earth Science; 60 in Spanish;[4] 66 in Studio Art; and 65 in Gym, for a cumulative average of 72 (id.).  The hearing record also references one incident of bullying of the student allegedly occurring during his ninth grade year, but does not specify details (see Tr. p. 60).

      On September 18, 2008, the student's mother consulted the district high school's vice-principal and school psychologist to address her son's "social difficulty" with and feeling of "disconnection" from other students at the district high school (Tr. pp. 60-63; Dist. Ex. 3 at p. 1).  The hearing record also evidences several alleged incidents of bullying of the student at the start of the 2008-09 (tenth grade) school year which were reported to district personnel by the student's mother (see Tr. pp. 343-45, 396-405; Dist. Exs. 1 at pp. 1-2; 3; Parent Ex. H).[5]

---

[1] The hearing record is unclear whether the district was made aware of the alleged incidents of bullying of the student during his fifth and sixth grade years.  The hearing record does not contain an explanation of how the student "began to act out some of his aggression" (see Dist. Ex. 7 at p. 1).

[2] It is unclear from the hearing record whether the counseling was provided by the district as part of his educational program or was privately obtained.

[3] The exhibit list contained in the hearing record indicates that Parent Ex. "A" consisted of three pages; however, the report card contained in the hearing record is a one page document (see Parent Ex. A).

[4] The explanation of marking period entries on the report card contained in the hearing record indicates that "65" constituted a passing grade (Parent Ex. A).

[5] According to the school psychologist, the district maintained a "zero tolerance policy for bullying" and "it [was] the school's goal to assure that everyone feels safe and protected in school;" the hearing record reflects that neither the student nor his mother was able to provide district personnel with the names of students who reportedly bullied the student (Dist. Ex. 3 at p. 1; see Tr. pp. 396-99).

According to the student's performance card that addressed his academic performance during the first five weeks of his tenth grade school year, the student was doing "very good work" in Biology, Business Ownership/Marketing, and Global History, and was doing "satisfactory" work in Computer Graphics, Gym, and English; there were no comments relative to his performance in Geometry (Dist. Ex. 9; see Tr. p. 231). The student achieved the following grades during the first quarter of the 2008-09 school year: Biology, 75; Business Ownership/Marketing, 94; Computer Graphics, 75; Gym, 80; English, 65; Global History, 80; and Geometry, 65, for a cumulative average of 76 (Dist. Ex. 10).

On November 5, 2008, the student was involved in a "confrontation" with a group of other students in the hallway of the district high school (Dist. Exs. 1 at p. 2; 2 at pp. 1-2; 3; 4). Subsequent to this incident, district personnel reportedly observed demeanor changes in the student, including marked irritability, non-responsiveness, and anger (see Tr. pp. 69-73, 148, 208, 404-05; Dist. Exs. 3; 4; 5). According to the student's mother, the student began seeing a private therapist at this time and continued treatment with the private therapist through the commencement of the impartial hearing in the instant appeal (see Tr. pp. 391-92, 427-28, 572-73, 575-76; Parent Ex. H).

On November 10, 2008, in response to "antisocial behavior" the student exhibited in his biology class, the school's dean brought the student to his guidance counselor for a meeting, during which the guidance counselor discussed the possibility of the student taking honors-level classes in consideration of his "very good first quarter grades" (Tr. pp. 206-12; Dist. Exs. 1 at p. 2; 5; Parent Ex. B; see Tr. pp. 278-302, 444-49; Dist. Ex. 10). The student reported to the guidance counselor that "he doesn't have any friends and isolates himself" and "feels he has different views and when someone disagrees he tries to change them" (Tr. pp. 207-10; Dist. Ex. 5; Parent Ex. B). Approximately two or three days later, with the student's mother's permission, the guidance counselor introduced the student to the school's social worker (Tr. pp. 149, 212-15, 409-10; Dist. Exs. 3 at p. 2; 4; 5). During this meeting, the social worker reported that the student referred to the November 5, 2008 incident in the school hallway, remarked that other unnamed students were "speaking about him," and stated, in the presence of the school psychologist, that he wished for the group of other students to come look for him so that "he could give them what they had coming to them" (Tr. pp. 146-51; Dist. Exs. 3 at p. 2; 4).

On November 13, 2008, the student's mother met with the assistant principal for the district high school, the school psychologist, and the social worker, at which time district personnel expressed "concern about [the student's] overall functioning with respect to his perception of situations" and their "concern with respect to his reaction to the events;" they "strongly recommended a psychiatric evaluation to assess his level of functioning," explaining to the student's mother that "her son would be placed on home teaching until the evaluation was completed and a psychiatrist felt it was safe for him to return to school" (Tr. pp. 73-80, 112-13, 149-54, 353-61, 365-66, 410-14, 459; Dist. Exs. 1 at p. 2; 3 at p. 2; 4).

On November 18, 2008, the student was evaluated by a private psychiatrist at parental expense (Dist. Ex. 6; see Tr. pp. 361-63, 414-18; Dist. Ex. 1 at pp. 2-3). The private psychiatrist opined that the student was "in need of psychiatric medication and talk-therapy" and recommended that "[u]ntil improved, he cannot return to school [and] would benefit from house

tutoring for his own safety as well as his co-students and to improve his mental health" (Dist. Ex. 6 at p. 1; see Tr. pp. 80-82, 362-63, 415-18; Dist. Ex. 1 at pp. 2-3). She also recommended that the district schedule reevaluations of the student every three weeks and concluded that he "need[ed] weekly medication monitoring [and] once to twice a week psychotherapy" and noted that "[i]npatient psychiatric treatment is at all times recommended if [the student] feels the need to be hospitalized, or the school or the mental health professionals" (Dist. Ex. 6 at p. 2).[6]

On November 24, 2009, the student began treatment with a private therapist (Tr. pp. 572-73, 575-76, 634-51; Parent Ex. H at pp. 1-3; see Parent Ex. J). The private therapist observed that the student presented with depression and anxiety, and recommended individual therapy sessions to "[i]mprove/develop effective communication skills necessary for effective social interaction," as well as to "[d]evelop effective coping skills to tolerate frustration" and "[d]evelop strategies to strengthen reasoning skills" (Parent Ex. H at pp. 1, 11). She offered diagnoses of an adjustment disorder with anxiety and moderate depression, and traced the beginning of the student's socialization problems to the alleged bullying incidents in fifth grade (id. at pp. 13, 15-19, 21, 32; see Tr. pp. 615-16, 639-44, 647-48, 651-52, 752-54).[7]

At the request of the parents, the district conducted a second psychiatric evaluation of the student on November 26, 2008 (Dist. Ex. 7; see Tr. pp. 83-87, 368-72, 418, 420-24; Dist. Ex. 1 at pp. 2-3). The evaluating psychiatrist observed that the student appeared to present with anxiety, depression, and behavior problems related to "chronic stressors" and offered an Axis I diagnosis of an adjustment disorder with mixed disturbance and emotional conduct, and an Axis IV diagnosis of "[r]eported victimization of peer bullying" (Dist. Ex. 7 at p. 3; see Dist. Ex. 1 at p. 3). Treatment recommendations included continued outpatient psychiatric counseling and antidepressant/antianxiety medication (Dist. Ex. 7 at p. 3). The evaluating psychiatrist further commented that "[i]f the student were not to be compliant with these treatment recommendations, it is likely that he might continue to have anxiety and anger control problems," adding that because "his reported stressors are chronic and not likely to subside ... counseling would be beneficial" (id.).[8]

In December 2008, the district offered the student homebound instruction, where, according to the hearing record, he remained for the balance of the 2008-09 school year (see Tr.

---

[6] There is no indication in the hearing record that the private psychiatrist administered any psychiatric testing during this evaluation.

[7] The hearing record documents more than 40 visits by the student to the private therapist from November 24, 2008 through September 11, 2010 (see Tr. pp. 599-616, 659-703). The hearing record also indicates that on December 9, 2008 she referred the student for an evaluation for a PTSD stemming from his witnessing of the car accident that injured his mother and brother, and that the results of said evaluation confirmed that he met the criteria for a PTSD and for a depressive disorder, NOS (Tr. pp. 679-85, 693, 762; Parent Ex. H at pp. 22-24, 29). However, the hearing record does not contain a copy of the evaluative report resulting from this evaluation. The private therapist also denied that she administered any psychological testing to the student during her evaluation (Tr. p. 653).

[8] There is no indication in the hearing record that the evaluating psychiatrist administered any psychiatric testing during this evaluation.

pp. 87-88, 256, 371, 376-80; Dist. Ex. 1 at pp. 2-3).[9]  On January 14, 2009, the assistant principal telephoned the student's mother and informed her that the district "wanted to integrate [the student] back into the school" (Tr. pp. 370-71; Dist. Ex. 1 at p. 3).  Toward that end, on January 23, 2009, the district arranged a meeting with the student's parents, the district superintendent, and the assistant principal (Tr. pp. 373-76; Dist. Ex. 1 at p. 3).  After the district declined the parents' request to transfer the student to another district school, the parents declined the district's invitation to return the student to the district high school, citing consideration for his safety (Tr. pp. 373-76, 429-30, 432; see Dist. Ex. 1 at p. 3).

The hearing record reflects that the student achieved the following grades during the second quarter of the 2008-09 school year: Biology, 85; Business Ownership/Marketing, 92; Gym, 50; English, 90; Global History, 95; and Geometry, 70, for a cumulative average of 80 (Dist. Ex. 10).[10]  In June 2009, the student achieved the following results on his Regents examinations: Biology, 81; Global History, 80; and Geometry, 55 (Dist. Exs. 8; 11).  On June 25, 2009, the district notified the parents that the student had failed Gym and his Geometry Regents examination, and enclosed a registration form for enrolling the student in the district's summer school program (Parent Exs. C; D; see Tr. pp. 380-83).  The student's mother contacted the student's guidance counselor subsequent to receiving these documents and inquired about the possibility of homebound instruction sessions for the summer; after the guidance counselor advised her that this option was not available, the student's mother decided against returning the student to the district high school for the summer school program (Tr. pp. 383-85).  In June 2009, the parents enrolled the student at the NPS (see Tr. p. 385; Parent Exs. E; G).

**Due Process Complaint Notice**

On January 25, 2010, the parents filed a due process complaint notice, alleging that: the student was removed from the district high school without due process;[11] the homebound instruction program provided by the district was "incomplete and insufficient" to meet the student's needs; the student "suffered from anxiety and depressive symptoms and behavioral problems related to chronic stressors as a consequence of bullying and chronic mocking by his peers;" and since attending the NPS, the student's "overall situation ha[d] improved" because the school presented a "supportive environment which address[ed] the [student's] emotional and psychological issues" (Dist. Ex. 1 at pp. 1-3).  The parents sought reimbursement for tuition and related expenses for the student's 2009-10 (11th grade) and 2010-11 (12th grade) school years at the NPS (id. at pp. 3-4).

---

[9] The hearing record is unclear as to whether the district instituted homebound instruction for the student in late November 2008 or late December 2008 (compare Tr. p. 371, with Dist. Ex. 1 at p. 2).

[10] The hearing record reflects that the student's homebound instruction program did not include his Computer Graphics or Gym classes, and that these classes were not replaced with substitute classes (see Tr. pp. 377-78, 462-63, 776-78; Dist. Ex. 1 at pp. 2-3).

[11] According to the hearing record, the student was not subject to any disciplinary proceedings as a result of the November 5, 2008 incident (see Tr. pp. 102-03).

5

On February 9, 2010, the district's counsel forwarded correspondence to the parents' counsel documenting a telephone conversation occurring on the same date during which the parents' counsel agreed to extend the district's counsel's "time to respond to the due process complaint" (Dist. Ex. 12).  On February 23, 2010, the district responded to the due process complaint notice, asserting the following defenses: the district offered the student a free appropriate public education (FAPE) for the 2008-09 school year;[12] an impartial hearing officer lacked the subject matter jurisdiction to award the relief sought by the parents; the parents failed to exhaust administrative remedies; the student did not have a specific physical or mental condition which adversely impacted upon his educational performance to the extent that he required special education programs and/or related services; the parents failed to timely notify the district of their intention to remove the student from the district and unilaterally place him at the NPS; equitable considerations favored the district; and the district was not liable for money damages under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) (Dist. Ex. 2 at pp. 3-4).

## Impartial Hearing Officer Decision

An impartial hearing convened on June 11, 2010 and concluded on September 27, 2010, after six days of hearings (Tr. pp. 1, 199, 337, 494, 555, 745).  On November 23, 2010, the impartial hearing officer issued a decision determining that: she had subject matter jurisdiction over this case; the student should have been referred to the Committee on Special Education (CSE); the evidence contained in the hearing record established that the student had maintained inappropriate feelings under normal circumstances and a generally pervasive mood of unhappiness or depression for a sufficient length of time to qualify as a student with an emotional disturbance; the parents' unilateral placement of the student at the NPS was reasonable; equitable considerations favored the parents; and the parents were entitled to reimbursement for the student's tuition and expenses at the NPS for the 2009-10 school year (IHO Decision at pp. 15, 17-21).  As for the 2010-11 school year, the impartial hearing officer denied the parents' request for tuition reimbursement as premature (id. at p. 22).

## Appeal for State-Level Review

The district appeals, contending that: the impartial hearing officer lacked subject matter jurisdiction over the instant appeal; the district did not ignore its child find obligations, because there was no reasonable basis for the district to suspect that the student had a disability, insofar as there was no indication that the student's emotional difficulties either existed for a long period of time or significantly affected his educational performance; there was no evidence contained in the hearing record establishing that the student's behaviors persisted for a sufficient period of time and rose to a sufficient level to affect his educational performance and render him eligible

---

[12] The term "free appropriate public education" means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
(20 U.S.C. § 1401[9]; see 34 C.F.R. § 300.17).

to receive special education programs and services as a student with an emotional disturbance; the determination that the NPS was an appropriate placement for the student during the 2009-10 school year was contrary to law and not supported by the evidence contained in the hearing record; and the determination that equitable considerations favored an award of tuition reimbursement for the 2009-10 school year was erroneous.

The parents answer, countering that: the district's jurisdictional objection to the sufficiency of the due process complaint notice was untimely; the due process complaint notice was sufficiently drafted to confer subject matter jurisdiction; the impartial hearing officer correctly determined that the student was eligible for special education and related services as a student with an emotional disturbance; the impartial hearing officer correctly determined that the parents' placement of the student at the NPS was reasonable and that under the circumstances, tuition reimbursement for the 2009-10 school year was appropriate; and the impartial hearing officer correctly determined that tuition reimbursement for the 2009-10 school year should not be reduced or denied pursuant to 20 U.S.C. § 1412(a)(10)(C)(I)-(III) and 34 C.F.R. § 300.148(d).

The parents also cross-appeal the impartial hearing officer's November 23, 2010 decision to the extent that it considered the merits of the district's argument challenging subject matter jurisdiction and denied their request for tuition reimbursement for the student's 2010-11 school year at the NPS. In its answer to the cross-appeal, the district asserts that: as the prevailing party, the parents lack standing to cross-appeal the impartial hearing officer's determination on the issue of subject matter jurisdiction, as they are not aggrieved parties; the parents failed to allege or demonstrate during the impartial hearing that the district failed to offer the student a FAPE during the 2010-11 school year or that the private placement was appropriate so as to warrant an award of tuition reimbursement; and the parents are not entitled to reimbursement for anticipated expenses for private tuition and other costs.

## Discussion

### Jurisdiction

Preliminarily, I will address the issue of whether the impartial hearing officer properly exercised subject matter jurisdiction to conduct an impartial hearing in this case. The IDEA provides for impartial hearings and State-level reviews in matters relating to the identification, evaluation or educational placement of students, or the provision of a FAPE (20 U.S.C. § 1415[b][6][A]; 34 C.F.R. § 300.507[a][1]; 8 NYCRR 200.5[i][1], [j][1]). In pertinent part, a due process complaint notice shall include the name and address of the student and the name of the school which the student is attending, a description of the nature of the problem of the student relating to the proposed or refused initiation or change, including facts relating to the problem, and a proposed resolution of the problem (20 U.S.C. § 1415[b][7][A][ii]; 34 C.F.R. § 300.508[b]; 8 NYCRR 200.5[i][1]). Failure to conform to the minimal pleading requirements of the statute may render a due process complaint notice legally insufficient (see M.S.-G v. Lenape Regional High Sch. Dist. Bd. of Educ., 2009 WL 74396, at *2-*3 [3d Cir. 2009] [affirming the district court's finding that dismissal of a due process complaint notice under the IDEA for failure to allege facts related to the problem was proper]). An impartial hearing may

not proceed unless the due process complaint notice satisfies the sufficiency requirements (20 U.S.C. § 1415[b][7][B]; 34 C.F.R. § 300.508[c]; 8 NYCRR 200.5[i][2]).[13]

The IDEA further provides that for purpose of meeting the sufficiency requirements, a due process complaint notice is deemed to be sufficient unless the district informs the impartial hearing officer within 15 days that the district believes the due process complaint fails to meet the minimal pleading requirements (20 U.S.C. §§ 1415[c][2][A], [c][2][B][i][II]; 34 C.F.R. § 300.508[d]; 8 NYCRR 200.5[i][3], [6]). Where there has been the allegation of an insufficient due process complaint notice, State and federal regulations provide "[w]ithin five days of the receipt of the notice of insufficiency, the impartial hearing officer shall make a determination on the face of the notice of whether the notification meets the requirements . . . and shall immediately notify the parties in writing of such determination" (see 8 NYCRR 200.5[i][6][ii]; see also 34 C.F.R. § 300.508[d][2]). If the case involves a matter that requires an expedited hearing related to student discipline and suspension (see 8 NYCRR 201.11), a party may not challenge the sufficiency of a due process complaint using the procedure describe above (8 NYCRR 200.5[i][3]).

In the instant appeal, the district obtained consent from the parent for an extension of time to respond to the due process complaint notice, but did not submit a written challenge to the sufficiency of the due process complaint notice to the impartial hearing officer and the parents within the prescribed timelines as provided for under State and federal regulations (Tr. pp. 807-810, 813-818; Dist. Ex. 12; see 8 NYCRR 200.5[i][3], [6]; see also 34 C.F.R. § 300.508[d]). Under these circumstances in which the district did not render a timely sufficiency challenge, the January 25, 2010 due process complaint notice was deemed sufficient and the impartial hearing officer became obligated to convene the impartial hearing (see 20 U.S.C. §§ 1415[c][2][A], [c][2][B][i][II]; 34 C.F.R. § 300.508[d]; 8 NYCRR 200.5[i][3], [6]). While the specificity of the parents' due process complaint notice may not have comported with pleading requirements in a court of law, for purposes of an administrative hearing under the IDEA, the due process complaint notice provided the district with notice that the parents wanted an impartial hearing pursuant to State regulations regarding the evaluation and educational placement of the student, who they suspected of having a disability (Dist. Ex. 1 at p. 1). The parents described the factual

---

[13] The Senate Report pertaining to the 2004 amendments to the IDEA noted that "the purpose of the sufficiency requirement is to ensure that the other party, which is generally the school district, will have an awareness and understanding of the issues forming the basis of the complaint" (S. Rep. 108-185 at p. 35, Individuals with Disabilities Education Act Senate Report No. 108-185, "Notice of Complaint," [November 3, 2003]). The Senate Committee reiterated that they assumed with the earlier 1997 amendments' notice requirement that it "would give school districts adequate notice to be able to defend their actions at due process hearings, or even to resolve the dispute without having to go to due process," adding that "[t]he committee does not intend for a notice of a due process complaint to reach the level of specificity and detail of a pleading or complaint filed in a court of law" (id.; see Knight v. Washington Sch. Dist., 2010 WL 1909581, at *4 n.4 [E.D.Mo. May 10, 2010]). However, it is important for an impartial hearing officer to assist the parties in resolving which issues will be decided at an impartial hearing, especially in cases where the responding party rather than the complaining party has the burden of proof. Discussing this issue prior to the Supreme Court's decision in Schaffer v. Weast (546 US 49 [2005]) at a time the burden of proof under the IDEA was typically placed on school districts, the Senate Committee nevertheless indicated that Congress did not intend to "forc[e] the school to prepare for any and every issue that could be possibly raised against it" by merely alleging that a student was denied a FAPE (S. Rep. 108-185 at p. 35).

circumstances of the student's removal from the public school and their dissatisfaction with that process (id. at pp. 1-3). The parents also alleged specific facts regarding their belief that the services provided by the district to the student while not attending school were inadequate (id. at p. 3). Additionally, the parents noted that they intended to seek tuition reimbursement for their unilateral placement of the student at the NPS (id. at p. 4). Even if the district had timely challenged the due process complaint notice as insufficient, there is a strong likelihood that the due process complaint notice was nevertheless sufficient to continue to confer jurisdiction upon the impartial hearing officer to proceed with the impartial hearing process and issue a decision (see Lilbask v. State of Connecticut Dep't of Educ., 397 F.3d 77, 93-95 [2d Cir. 2005]).[14]

### Child Find

I will now consider the district's argument on appeal that the impartial hearing officer erred when she determined that the district violated its child find obligations by not referring the student to the district's CSE and thereby, denied the student a FAPE. The purpose of the "child find" provisions of the IDEA are to identify, locate, and evaluate students who are suspected of being a student with a disability and thereby may be in need of special education and related services, but for whom no determination of eligibility as a student with a disability has been made (see Handberry v. Thompson, 446. F.3d 335, 347-48 [2d Cir. 2006]; A.P. v. Woodstock Bd. of Educ., 572 F.Supp.2d 221, 225 [D. Conn. 2008] aff'd 2010 WL 1049297 [2d Cir. March 23, 2010]; see also 20 U.S.C. § 1412[a][3][A]; 34 C.F.R. § 300.111; 8 NYCRR 200.2[a][7]). The IDEA places an affirmative duty on State and local educational agencies to identify, locate, and evaluate all children with disabilities residing in the State "to ensure that they receive needed special education services" (20 U.S.C. § 1412[a][3]; 34 C.F.R. § 300.111[a][1][i]; Forest Grove, 129 S. Ct. at 2495; see 20 U.S.C. § 1412[a][10][A][ii]; see also 8 NYCRR 200.2[a][7]; New Paltz Cent. Sch. Dist. v. St. Pierre, 307 F. Supp. 2d 394, 400, n.13 [N.D.N.Y. 2004]). The "child find" requirements apply to "children who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade" (34 C.F.R. § 300.111[c][1]; see 8 NYCRR 200.2[a][7]). To satisfy the requirements, a board of education must have procedures in place that will enable it to find such children (Application of a Student

---

[14] Although I have rejected the district's jurisdictional/sufficiency argument in this instance, I note that on the last day of the impartial hearing it remained apparent that the parties and impartial hearing officer remained confused regarding the legal basis of the parents' assertions (Tr. pp. 787-94). Even in circumstances in which a party has failed to challenge a due process complaint notice as insufficient and it has been deemed sufficient, the IDEA does not require an impartial hearing to proceed thereafter without structure. Although the party requesting an impartial hearing has the first opportunity to define the scope of issues to be decided in the impartial hearing by filing the due process complaint notice, neither State nor federal regulations preclude the opposing party from asking an impartial hearing officer to conference a case for the purpose of simplifying, clarifying or appropriately narrowing the range of issues that must be determined in an impartial hearing (see, e.g., 8 NYCRR 200.5[j][iii][ix]). Additionally, aside from a motion to dismiss for failure to state a claim, which is akin to a sufficiency challenge under the IDEA, a party is not precluded from seeking to use other summary procedures where it becomes clear that a need for further hearing is unnecessary. Although the use of summary disposition procedures akin to those used in judicial proceedings are permissible under the IDEA, such procedures should be used by the impartial hearing officer with caution and are appropriate in instances in which the parties have had a meaningful opportunity to present evidence and the nonmoving party is unable to identify any genuine issue of material fact (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]; Application of the Bd. of Educ., Appeal No. 10-014; Application of the Bd. of Educ., Appeal No. 05-007; Application of a Child Suspected of Having a Disability, Appeal No. 04-059; Application of a Child with a Disability, Appeal No. 04-018).

Suspected of Having a Disability, Appeal No. 10-009; Application of a Student Suspected of Having a Disability, Appeal No. 09-132; Application of a Child with a Disability, Appeal No. 07-062; Application of a Child Suspected of Having a Disability, Appeal No. 05-090; Application of a Child with a Disability, Appeal No. 04-054; Application of a Child Suspected of Having a Disability, Appeal No. 01-082; Application of a Child with a Disability, Appeal No. 93-41).

Because the child find obligation is an affirmative one, the IDEA does not require parents to request that the district evaluate their child (Application of a Child Suspected of Having a Disability, Appeal No. 05-127; Application of a Child Suspected of Having a Disability, Appeal No. 05-040; Application of a Child with a Disability, Appeal No. 03-043; Application of a Child Suspected of Having a Disability, Appeal No. 01-082). A district's child find duty is triggered when there is "reason to suspect a disability and reason to suspect that special education services may be needed to address that disability" (New Paltz, 307 F. Supp. 2d at 400, n.13, quoting Dep't of Educ. v. Cari Rae S., 158 F. Supp. 2d 1190, 1194 [D. Haw. 2001]; see Application of a Student Suspected of Having a Disability, Appeal No. 10-128; Application of a Child Suspected of Having a Disability, Appeal No. 06-092; Application of a Child Suspected of Having a Disability, Appeal No. 06-087; Application of a Child Suspected of Having a Disability, Appeal No. 05-127; Application of a Child Suspected of Having a Disability, Appeal No. 05-040; Application of a Child Suspected of Having a Disability, Appeal No. 04-087; Application of the Bd. of Educ., Appeal No. 04-037; Application of a Child with a Disability, Appeal No. 03-043; Application of a Child with a Disability, Appeal No. 02-092; Application of a Child Suspected of Having a Disability, Appeal No. 01-082). To determine that a child find violation has occurred, school officials must have overlooked clear signs of disability and been negligent by failing to order testing, or have no rational justification for deciding not to evaluate (A.P., 572 F.Supp.2d at 225, quoting Bd. of Educ. v. L.M., 478 F.3d 307, 313 [6th Cir. 2007]). States are encouraged to develop "effective teaching strategies and positive behavioral interventions to prevent over-identification and to assist students without an automatic default to special education" (Los Angeles Unified Sch. Dist. v. D.L., 548 F.Supp.2d 815, 819 [C.D.Cal. 2008] referencing 20 U.S.C. § 1400[c][5]). Additionally, the school district must initiate a referral and promptly request parental consent to evaluate a student to determine the student needs special education services and programs if a student has not made adequate progress after an appropriate period of time when provided instruction in a school district's response to intervention programs (8 NYCRR 200.4[a]).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; see M.P.G. v. New York City Dep't of Educ., 2010 WL 3398256, at *7 [S.D.N.Y. Aug. 27, 2010]).

In this case, I find that the district did not meet its burden of proof to show that it complied with its child find obligation. In the course of describing the process followed by the district in referring students for CSE evaluation, the district social worker explained that those students identified as having "a combination of behavior problems and learning problems" would be addressed initially through a "pupil personnel meeting," whereby district personnel would "discuss what the nature of the concern was and develop a plan how to intervene prior to

referring" (Tr. pp. 145-46, 163; see IHO Ex. II). He added that he was informed by the student's science teacher that prior to the student's change in behavior observed in November 2008, the student presented no academic or behavioral concerns in her class (Tr. pp. 148-49, 164; see IHO Ex. II). He further opined that he did not deem referral of the student to the CSE necessary at that time because he felt that the student presented no chronic academic problem, and that during his 20 years of experience, he had previously identified other students with behavioral issues similar to the students whom he did not refer to the CSE (Tr. pp. 154-55, 161-62; see IHO Ex. II). He also noted that when he spoke to the private psychiatrist who examined the student on November 18, 2008, she did not recommend referral of the student to the CSE (Tr. pp. 155-57).

The school psychologist acknowledged that she had previously referred those students to the CSE for evaluation whose ability to function academically was "compromise[d] to a marked degree over a long period of time, and if they were unresponsive to intervention that the building level provided," if "they were still having difficulty attaining age-appropriate level performance," or if she suspected they presented with learning disabilities, emotional disturbances,[15] or other health impaired issues (Tr. pp. 57-59, 102). She explained that prior to the November 5, 2008 incident, the student had been "functioning within the average range, according to the reports of his guidance counselor" and that "[a]cademics were never a concern for [the student] (Tr. pp. 63, 114, 136-37; see Tr. pp. 210-11, 346, 350-51, 404, 444-49; Dist. Ex. 5). Although she eventually became aware of the student's demeanor change in November 2008, she saw no reason to refer him to the CSE at that time because she considered the student's functioning issue as "episodic" rather than chronic, insofar as she did not believe it had been present for a long period of time or materially affected his grades, and neither the two evaluating psychiatrists nor the student's mother ever requested referral of the student to the CSE during her conversations with them (Tr. pp. 63-64, 69-73, 82, 85, 95-99, 133-34).

However, while the hearing record demonstrates that in this instance no disciplinary action was taken against the student stemming from the November 5, 2008 incident, it also establishes that district personnel were "very concerned with respect to his reaction to the events," "strongly recommended a psychiatric evaluation to assess his level of functioning," and " as a team did not feel it was appropriate for him to remain in school" until such time as he underwent a psychiatric evaluation; consequently, the district placed the student on homebound

---

[15] According to State and federal regulations, a student with an emotional disturbance must meet one or more of the following five characteristics:
(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
(C) Inappropriate types of behavior or feelings under normal circumstances.
(D) A general pervasive mood of unhappiness or depression.
(E) A tendency to develop physical symptoms or fears associated with personal or school problems.
(34 C.F.R. § 300.8[c][4]; see 8 NYCRR 200.1[zz][4]). Additionally, the student must exhibit one or more of the five characteristics over a long period of time and to a marked degree that adversely affects the student's educational performance (id.; see N.C. v Bedford Cent. Sch. Dist., 2008 WL 4874535 [2d Cir. 2008]; see also Maus v. Wappingers Cent. Sch. Dist., 2010 WL 451046 [S.D.N.Y. Feb. 9, 2010]; A.J. v. Bd. of Educ., East Islip Union Free Sch. Dist., 2010 WL 126034 [E.D.N.Y. Jan. 8, 2010]). While the term "emotional disturbance" includes schizophrenia, the term does not apply to students who are socially maladjusted, unless it is determined that they otherwise meet the criteria above (34 C.F.R. § 300.8[c][4]; see 8 NYCRR 200.1[zz][4]; New Paltz, 307 F. Supp. 2d at 398).

instruction in December 2008 which ultimately continued for the balance of the 2008-09 school year (Tr. pp. 73-80, 102-03, 113, 149-54, 353-61, 365-66, 410-14, 459; Dist. Exs. 1 at p. 2; 3 at p. 2; 4).[16]   The hearing record establishes that although the district did not impose a formal disciplinary suspension upon the student in the aftermath of the November 5, 2008 incident, it did consider the student's behavior to constitute sufficient cause to remove him from the school premises, order a psychiatric evaluation, and change his educational placement from a general education classroom to homebound instruction.  This series of actions strongly suggests that the district had reason to suspect that the student may have had a disability and may need special education, thereby triggering its obligation to refer the student for evaluation by the CSE (see Appeal of a Student Suspected of Having a Disability, 38 Ed Dep't Rep 52, Decision No. 13,980 [holding that a superintendent who required student to have psychiatric examination after misconduct should reasonably have suspected student of having a disability, and thus should have referred student to CSE]; Appeal of Pinckney, 37 Ed Dep't Rep 284, Decision No. 13,860 [noting that a superintendent is not permitted to order psychological examination as part of a penalty for suspension; if such an examination is determined to be warranted, proper avenue is referral of student to CSE]; Appeal of a Student with a Disability, 35 Ed Dep't Rep 17, Decision No. 13,448 [explaining that when district staff should reasonably suspect that a student has a disability, the hearing process under N.Y. Educ. Law § 3214 calls for referral of the student to the CSE for evaluation if a nexus is found between conduct underlying disciplinary charges and suspected disability or handicapping condition]; Appeal of a Student with a Disability, 33 Ed Dep't Rep 1, Decision No. 12,955 [holding that school administrators have a duty to refer a student directly to the CSE when there is a reasonable basis to suspect that the student may have a disability; the unilateral placement of a resident student by the parents does not relieve district of its obligation to refer a student who may have a disability to the CSE for an evaluation]).

Furthermore, the content of the evaluative reports received by the district prior to its implementation of homebound instruction identified the student's social/behavioral concerns sufficiently to warrant referral to the CSE.   The private psychiatrist evaluation report of November 18, 2008 cautioned the district that the student was "in need of psychiatric medication and talk-therapy" and recommended that "[u]ntil improved, he cannot return to school [and] would benefit from house tutoring for his own safety as well as his co-students and to improve his mental health" (Dist. Ex. 6 at p. 1; see Tr. pp. 80-82, 362-63, 415-18; Dist. Ex. 1 at pp. 2-3). The November 26, 2008 evaluative report of the district's own evaluating psychiatrist diagnosed the student with an adjustment disorder with mixed disturbance and emotional conduct, and cautioned that if the student did not follow recommendations of outpatient psychiatric counseling and antidepressant/antianxiety medication, his anxiety and anger control problems would likely persist (Dist. Ex. 7 at p. 3; see Dist. Ex. 1 at p. 3).

Based upon a review of the evidence contained in the hearing record, I concur with the impartial hearing officer's determination that the district failed to meet its child find obligation to

---

[16]There is no indication in the hearing record that the recommendations of the private psychiatrist who evaluated the student on November 18, 2008, which included reevaluations of the student every three weeks, weekly medication monitoring, psychotherapy twice per week, and inpatient psychiatric treatment, actually took place prior to the district's meeting with the parents on January 23, 2009, during which district staff invited the student to return to school (Tr. pp. 370-71, 373-76; Dist. Exs. 1 at p. 3; 6 at p. 2).

this student as a result of events occurring during the 2008-09 school year.[17]   Next, I will consider whether the parents satisfied their burden of proving that the NPS was an appropriate placement for the student for the 2009-10 and 2010-11 school years.

**Applicable Standards – Unilateral Placement**

A private school placement must be "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., the private school offered an educational program which met the student's special education needs (see Gagliardo, 489 F.3d at 112, 115; Walczak, 142 F.3d at 129; Matrejek, 471 F. Supp. 2d at 419).  A parent's failure to select a program approved by the State in favor of an unapproved option is not itself a bar to reimbursement (Carter, 510 U.S. at 14).  The private school need not employ certified special education teachers or have its own individualized education program (IEP) for the student (Carter, 510 U.S. 7; Application of the Bd. of Educ., Appeal No. 08-085; Application of the Dep't of Educ., Appeal No. 08-025; Application of the Bd. of Educ., Appeal No. 08-016; Application of the Bd. of Educ., Appeal No. 07-097; Application of a Child with a Disability, Appeal No. 07-038; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-105). Parents seeking reimbursement "bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate" (Gagliardo, 489 F.3d at 112; see M.S. v. Bd. of Educ., 231 F.3d 96, 104 [2d Cir. 2000]).  "Subject to certain limited exceptions, 'the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement...'" (Gagliardo, 489 F.3d at 112; Frank G. v. Bd. of Educ., 459 F.3d at 364 [2d Cir. 2006] [quoting Rowley, 458 U.S. at 207 and identifying exceptions]).  Parents need not show that the placement provides every special service necessary to maximize the student's potential (Frank G., 459 F.3d at 364-65).  When determining whether the parents' unilateral placement is appropriate, "[u]ltimately, the issue turns on" whether that placement is "reasonably calculated to enable the child to receive educational benefits" (Frank G., 459 F.3d at 364; see Gagliardo, 489 F.3d at 115 [citing Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 [6th Cir. 2003] [stating "evidence of academic progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA"]]).  A "private placement is only appropriate if it provides 'education instruction specifically designed to meet the unique needs of a handicapped child'" (Gagliardo, 489 F.3d at 115 [emphasis in original], citing Frank G., 459 F.3d at 365 quoting Rowley, 458 U.S. at 188-89).

The Second Circuit has set forth the standard for determining whether parents have carried their burden of demonstrating the appropriateness of their unilateral placement.

---

[17] I note that the parents do not allege in the due process complaint notice or in the cross-appeal that the alleged incidents of bullying referenced in the hearing record deprived the student of a FAPE (see Dist. Ex. 1). However, even if the parents did advance this argument, I conclude that a review of the evidence contained in the hearing record does not support such an allegation (see T.B. & M.B. v. Waynesboro Area Sch. Dist., 2011 WL 718516, at *1, *4 [M.D. Pa. Feb. 22, 2011]; Emily Z. v. Mt. Lebanon Sch. Dist., 2007 WL 3174027, at *1-*4 [W.D. Pa. Oct. 29, 2007]; Appeal of M.G. and J.G., 40 Ed Dep't Rep 336, Decision No. 14,491 [holding that the evidence did not show that the district failed to provide a safe educational environment that would permit the student's reentry into the school]).

No one factor is necessarily dispositive in determining whether parents' unilateral placement is reasonably calculated to enable the child to receive educational benefits. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the totality of the circumstances in determining whether that placement reasonably serves a child's individual needs. To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential. They need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction.

(Gagliardo, 489 F.3d at 112; see Frank G., 459 F.3d at 364-65).

**Parents' Unilateral Placement – 2009-10 School Year**

Assuming, without deciding, that the CSE would have determined that the student was eligible for special education and related services and would have continued the student's eligibility at an annual review conducted thereafter,[18] I find that with respect to the parents' tuition reimbursement claim the hearing record contains a paucity of evidence describing the student's educational program at the NPS. The parents produced no witnesses from the NPS during the impartial hearing, and the only documentary evidence from the school is the student's 2009-10 report card (see Parent Ex. F). The student's mother described the NPS as a college preparatory, parochial school, and maintained that she "had no choice" but to enroll the student in the NPS for the 2009-10 school year, noting that her options were limited to continuing the student on home instruction or placing him in a school where he would have some social interaction, be safe, and "maybe … focus on his studies" (Tr. p. 385). Treatment notes maintained by the student's private therapist indicated that the NPS provided the student with a peer mentor (Parent Ex. H at p. 25), and during the impartial hearing, she opined that the NPS was an appropriate placement for the student in January 2009 because "he would be in a different environment to start over" and "the hope would have been to make relationships, establish relationships there, and be taken out of the stressors in the [district] environment …" (Tr. pp. 616-620; see Tr. pp. 768-70). Although there is no reason to doubt the sincerity of the parents' concerns, it does not alter the fact that during the impartial hearing the student's mother conceded that the student was not receiving special education services at the NPS (Tr. p. 458).

Based upon the foregoing, I conclude that the parents did not meet their burden to demonstrate how the program provided at the NPS was specially designed to meet the student's unique needs for the 2009-10 school year, and thus, the parents are not entitled to tuition reimbursement (Gagliardo, 489 F.3d at 115). A unilateral private placement is only appropriate

---

[18] I note that even near the conclusion of the hearing record the parents, through their counsel, took the position that they had not decided whether they wanted the student to be evaluated and to receive special education services from the district (Tr. p. 787).

14

if it provides "education instruction specifically designed to meet the unique needs of a handicapped child" (Gagliardo, 489 F.3d at 115 [quoting Frank G., 459 F.3d at 365]; see also Rowley, 458 U.S. at 188-89). Having decided that the parents failed to meet the second criterion for an award of tuition reimbursement, the necessary inquiry is at an end and I need not reach the issue of whether equitable considerations support the parents' claim (see M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 [2d Cir. 2000]). Accordingly, I will annul that aspect of the impartial hearing officer's November 23, 2010 decision finding to the contrary.

## Cross-Appeal

### Premature Claim/Ripeness

I will now address the parents' cross-appeal. The parents contend that the impartial hearing officer erroneously dismissed their claim for tuition reimbursement for the student's 2010-11 school year at the NPS as premature, maintaining that there was no evidence in the hearing record demonstrating that a CSE would determine the student eligible for special education and related services. An appropriate educational program begins with an IEP that accurately reflects the results of evaluations to identify the student's needs, establishes annual goals related to those needs, and provides for the use of appropriate special education services (Application of a Student with a Disability, Appeal No. 08-077; Application of the Bd. of Educ., Appeal No. 08-016; Application of the Dep't. of Educ., Appeal No. 07-018; Application of a Child with a Disability, Appeal No. 07-008; Application of the Bd. of Educ., Appeal No. 06-076; Application of a Child with a Disability, Appeal No. 06-059; Application of the Bd. of Educ., Appeal No. 06-029; Application of a Child with a Disability, Appeal No. 04-046; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-095; Application of a Child Suspected of Having a Disability, Appeal No. 93-9). With certain exceptions, a student's IEP is required to be reviewed periodically, but not less frequently than annually, and revised as appropriate (20 U.S.C. § 1414[d][4][A]; 34 C.F.R. § 300.324[b][1][i]; see also Educ. Law § 4402[2]; 8 NYCRR 200.4[f]). The CSE is required to develop an IEP that accurately reflects the student's special education needs (34 C.F.R. § 300.306[c][2]; 8 NYCRR 200.4[d][2]). Incumbent with that duty is the mandate that the IEP "shall report the present levels of academic achievement and the functional performance and indicate the individual needs of the student." (8 NYCRR 200.4[d][2]; see 34 C.F.R. § 300.320 [a][1]). Moreover, a CSE is required to "consider" information about the student provided to, or by, the parents (8 NYCRR 200.4[f][2][ii]; Application of a Child with a Disability, Appeal No. 07-139).

Proper consideration of evaluative information is also important in order to determine whether the student needs to be reevaluated. A reevaluation of the student is required if the school district "determines that the educational or related service needs, including improved academic achievement and functional performance, of the child warrant reevaluation" or upon request of the student's parents or teacher (20 U.S.C. § 1414[a][2][A][i]-[ii]; see 34 C.F.R. § 300.303[a]; 8 NYCRR 200.4[b][4]; see also Perricelli v. Carmel Cent. Sch. Dist., 2007 WL 465211, at *10-*11 [S.D.N.Y. Feb. 9, 2007]). Unless otherwise agreed to by the parent and the school district, a reevaluation must be conducted at least once every three years and not more than once per year (20 U.S.C. § 1414[a][2][B]; see 34 C.F.R. § 300.303[b]; 8 NYCRR

200.4[b][4]). "[T]he reevaluation shall be sufficient to determine the student's individual needs, educational progress and achievement, the student's ability to participate in instructional programs in regular education and the student's continuing eligibility for special education" (8 NYCRR 200.4[b][4]; see also Perricelli, 2007 WL 465211, at *11). Further, as part of its reevaluation, a school district is required to review existing evaluative data with respect to a student with a disability and determine whether additional data is necessary (20 U.S.C. § 1414[c][1][A] and [B]; 34 C.F.R. § 300.305; 8 NYCRR 200.4[b][5]).

At the time this proceeding was commenced in January 2010, there had been no CSE evaluation to determine whether the student is eligible for special education and related services for the 2010-11 school year, and hence, there is no way for either the impartial hearing officer or myself to know whether the CSE, if presented with such a referral would recommend that the student be eligible for special education as a student with a disability for the 2010-11 school year and, if so, what type of special education program and services the CSE may have recommended for the 2010-11 school year.   Accordingly, I concur with the impartial hearing officer's determination that the parents' claim for tuition reimbursement for the 2010-11 school year was premature and see no reason to disturb her denial of said claim (see Application of a Student with a Disability, Appeal No. 09-066; Application of a Student with a Disability, Appeal No. 08-028; Application of the Dep't of Educ., Appeal No. 07-037; Application of a Child with a Disability, Appeal No. 06-102; Application of a Child with a Disability, Appeal No. 00-040; Application of a Child with a Disability, Appeal No. 00-039).

In light of my earlier determination that the impartial hearing officer correctly exercised jurisdiction and conducted an impartial hearing in this case, it is unnecessary for me to consider the parents' additional argument relative to that issue advanced in the cross-appeal.

**Conclusion**

In sum, after reviewing the evidence contained in the hearing record, I disagree with the impartial hearing officer's determinations that the parents satisfied their burden of proving that the NPS was an appropriate placement for the student for the 2009-10 school year, and that they were entitled to reimbursement for tuition and expenses for the student's 2009-10 school year at the NPS and, therefore, I will annul those portions of the impartial hearing officer's November 23, 2010 decision to that effect.

I have considered the parties' remaining contentions and I find that I need not address them in light of my determinations.

**THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

**THE CROSS-APPEAL IS DISMISSED.**

**IT IS ORDERED** that the impartial hearing officer's decision dated November 23, 2010 is annulled to the extent that it determined that the parents satisfied their burden of proving that the NPS was an appropriate placement for the student for the 2009-10 school year and that the

16

parents were entitled to reimbursement for their son's tuition and expenses at the NPS for the 2009-10 school year.

Dated:          Albany, New York
                March  28     , 2011

                                        JUSTYN P. BATES
                                        STATE REVIEW OFFICER

**Exhibit B**



# The University of the State of New York

### The State Education Department
#### State Review Officer
#### www.sro.nysed.gov

No. 11-023

## Application of a STUDENT SUSPECTED OF HAVING A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the Brentwood Union Free School District

**Appearances:**

Law Offices of Wayne J. Schaefer, LLC, attorneys for petitioners, Wayne J. Schaefer, Esq., of counsel

Ingerman Smith, LLP, attorneys for respondent, Edward H. McCarthy, Esq., of counsel

### DECISION

Petitioners (the parents) appeal from the decision of an impartial hearing officer which denied their request to be reimbursed by respondent (the district) for their son's tuition costs at a nonpublic high school (NPS) for the 2009-10 and 2010-11 school years. The appeal must be sustained in part.

According to the record on appeal, the student experienced a "paranoid episode" and received diagnoses of a depressive disorder, anxiety, and behavioral problems secondary to reported peer bullying (Dist. Exs. 1 at pp. 2-5, 7-8; 5 at pp. 10-13, 15-19, 28-36, 38-40, 43).[1] The NPS has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7). The student's eligibility for special education and related services as a student with an emotional disturbance is in dispute in this appeal (see 34 C.F.R. § 300.8[c][4][i]; 8 NYCRR 200.1[zz][4]).

### Background

---

[1] The record on appeal contains duplicative exhibits (see Dist Exs. 1; 2; 5 at pp. 1-16; 6 at pp. 10-15). For purposes of this decision, the due process complaint notice filed by the parents is cited as "Dist. Ex. 1," the district's response to the due process complaint notice is cited as "Dist. Ex. 2," and the impartial hearing officer's decision is cited as "IHO 2 Decision."

The student's educational history was recently discussed in <u>Application of the Bd. of Educ.</u>, Appeal No. 10-129, and will not be repeated here in detail. In that proceeding, the parents filed a due process complaint notice dated January 25, 2010 requesting an impartial hearing (Hearing I) to adjudicate their claims therein and, for relief, the parents sought the costs of tuition reimbursement at the NPS for the 2009-10 and 2010-11 school years.[2]

**Due Process Complaint Notice**

On November 15, 2010, the parents filed a second due process complaint notice, alleging, among other things, that: (1) the student was removed from the district high school at the insistence of the district in mid-November 2008 "without due process;" (2) the homebound instruction program provided by the district was "incomplete and insufficient" to meet the student's needs; (3) a psychiatrist found that the student suffered from "anxiety and depressive symptoms and behavioral problems related to chronic stressors as a consequence of bullying and chronic mocking by his peers;" (4) after receiving the results of two psychiatric evaluations of the student in late November 2008, the district had reason to suspect that the student had an emotional disturbance as defined in State and federal regulations, yet the district failed to refer him to the Committee on Special Education (CSE) for an initial evaluation; and (5) that the NPS has been an appropriate placement for the student, insofar as the student has "displayed a positive mood" and "has been able to enter into good relationships with his teachers and guidance counselor and has exhibited social involvement with his peers" (Dist. Ex. 1 at pp. 2-8). The parents sought an order from an impartial hearing officer awarding reimbursement for "all costs and expenditures incurred as a result of having to enroll [the student] in [the NPS]" or alternatively, directing the district to refer the student to the CSE for evaluation of his eligibility to receive special education and related services as a student with a disability (<u>id.</u> at p. 8). The parents sought reimbursement for tuition and related expenses for the student's 2009-10 (eleventh grade) and 2010-11 (twelfth grade) school years at the NPS (<u>id.</u> at pp. 5, 8).

On November 23, 2010, the district responded to the parents' November 2010 due process complaint notice, asserting that: (1) it fulfilled its obligation to offer the student a free appropriate public education (FAPE)[3] for the 2008-09 school year; (2) the allegations contained in the November 2010 due process complaint notice were previously adjudicated at a prior impartial hearing and were therefore precluded under the doctrine of res judicata;[4] (3) the parents

---

[2] According to the hearing record, the student was allegedly the victim of a bullying incident on November 5, 2008, which ultimately led to his "removal" from the district high school in mid-November 2008; however, in the November 2010 due process complaint notice, the parents sought reimbursement for the 2009-10 and 2010-11 school years only, as the student had received homebound instruction for the balance of the 2008-09 school year and did not begin attending the NPS until the 2009-10 school year (see Dist. Ex. 1 at pp. 1-5).

[3] The term "free appropriate public education" means special education and related services that--
(A) have been provided at public expense, under public supervision and direction, and without charge;
(B) meet the standards of the State educational agency;
(C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
(D) are provided in conformity with the individualized education program required under section 1414(d) of this title.
(20 U.S.C. § 1401[9]; see 34 C.F.R. § 300.17).
[4] See <u>Application of the Bd. of Educ.</u>, Appeal No. 10-129.

2

failed to exhaust their administrative remedies; (4) the student did not have a specific physical or mental condition which adversely impacted upon his educational performance to the extent that he required special education programs and/or related services; (5) the parents failed to timely notify the district of their intention to remove the student from the district high school and unilaterally place him at the NPS; and (6) equitable considerations otherwise favored the district (Dist. Ex. 2 at pp. 1, 4-5).

**Impartial Hearing Officer Decision**

On December 28, 2010, the impartial hearing officer in the instant proceeding (Hearing Officer 2) conducted a prehearing conference,[5] during which the district argued that the parents' November 2010 due process complaint notice should be dismissed based on res judicata grounds, contending that the issues raised therein had already been adjudicated in Hearing I (Dist. Ex. 3 at pp. 1, 5-26; see Application of the Bd. of Educ., Appeal No. 10-129). Hearing Officer 2 granted leave to the parties to submit briefs on the issue, and the district moved to dismiss the November 2010 due process complaint notice on the grounds of res judicata and collateral estoppel on January 10, 2011; the parents opposed the motion on the following day (Dist. Exs. 5; 6). Hearing Officer 2 subsequently issued an undated decision in which he determined that all of the remedies sought in the parents' November 2010 due process complaint notice had been addressed during Hearing I and in the resultant November 23, 2010 decision of a different impartial hearing officer (Hearing Officer 1) (see Dist. Ex. 5 at pp. 22-48; Application of the Bd. of Educ., Appeal No. 10-129).[6] Consequently, Hearing Officer 2 dismissed the November 2010 due process complaint notice pursuant to the doctrine of res judicata (IHO 2 Decision at p. 2). This appeal ensued.

**Appeal for State-Level Review**

The parents appeal Hearing Officer 2's decision, contending, among other things, that the district is precluded from moving to dismiss the November 2010 due process complaint notice because the district failed to challenge the sufficiency of the due process complaint notice under State regulations (see 8 NYCRR 200.5[i][3], [6]; see also 34 C.F.R. § 300.508[d][1]-[2]). The parents seek an order reversing Hearing Officer 2's decision in its entirety and reinstating the November 2010 due process complaint notice.[7]

---

[5] State regulations set forth provisions for conducting a prehearing conference to simplify or clarify the issues that will be addressed in an impartial hearing (8 NYCRR 200.5[j][3][xi][a]).

[6] In the petition, the parents ascribe a date of "January 18, 2011" to Hearing Officer 2's decision; however, the decision contained in the hearing record on appeal is undated, and there is no indication in the hearing record as to the date that the decision was issued.

[7] At the time the parents filed the petition in the instant proceeding, the district's prior request for State-level review of the November 23, 2010 decision of Hearing Officer 1 was pending. Consequently, the parents also argue in the petition that the district was barred from invoking res judicata or collateral estoppel, because at the time the district filed the instant appeal, the prior appeal had not yet been decided (see 34 C.F.R. § 300.514[a]; 8 NYCRR 200.5[i][5][v], [k]), and sought a stay of the instant proceeding until the prior appeal was resolved. A final determination was reached by Hearing Officer 1 with regard to the 2009-10 school year on November 23, 2010. The pendency of an appeal does not divest a decision on the merits of the requisite finality for res judicata or collateral estoppel purposes (DiSorbo v. Hoy, 343 F.3d 172, 183 [2d Cir. 2003]; Depasquale v.

The district answers, maintaining that: (1) the November 2010 due process complaint notice is barred by the doctrines of res judicata and collateral estoppel; (2) there is no authority permitting the parents to file multiple due process complaint notices on the same set of factual issues; and (3) the November 2010 due process complaint notice is "frivolous, unreasonable, and without foundation" pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(II)-(III) and 34 C.F.R. § 300.517(a)(1)(ii).

The parents reply, alleging that there is no merit to the district's contentions that the November 2010 due process complaint notice is frivolous, unreasonable, and without foundation.

## Discussion and Conclusion

With respect to their son's 2009-10 school year at the NPS, based upon a review of the record on appeal and for the reasons expressed below, I concur with the impartial hearing officer that principles of res judicata preclude the parents' tuition reimbursement claim.

The doctrine of res judicata "precludes parties from litigating issues 'that were or could have been raised' in a prior proceeding" (Perez v. Danbury Hosp., 347 F.3d 419, 426 [2d Cir. 2003]; Murphy v. Gallagher, 761 F.2d 878, 879 [2d Cir. 1985]; Grenon v. Taconic Hills Cent. Sch. Dist., 2006 WL 3751450, at *6 [N.D.N.Y. Dec. 19, 2006]; Application of a Student with a Disability, Appeal No. 10-072; Application of a Student with a Disability, Appeal No. 09-025; Application of a Student with a Disability, Appeal No. 08-093; Application of a Student with a Disability, Appeal No. 08-076; Application of a Child with a Disability, Appeal No. 07-093; Application of a Child with a Disability, Appeal No. 06-100; Application of a Child with a Disability, Appeal No. 05-072; Application of a Child with a Disability, Appeal No. 04-099). The rule applies not only to claims actually litigated, but also to claims that could have been raised in the prior litigation. The rationale underlying this principle is that a party who has been given a full and fair opportunity to litigate a claim should not be allowed to do so again (In re Hunter, 4 N.Y.3d 260, 269 [2005]). "[P]rinciples of res judicata require that 'once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy'" (Chen v. Fischer, 6 N.Y.3d 94, 100 [2005], quoting O'Brien v. City of Syracuse, 54 N.Y.2d 353, 357 [1981]; In re Hunter, 4 N.Y.3d at 269; see Ross v. Board of Educ. of Tp. High Sch. Dist. 211, 486 F.3d 279, 283 [7th Cir. 2007] [describing a transaction as a "common core of operative fact"]; see also Waldman v. Village of Kiryas Joel, 207 F.3d 105, 110-11 [2d Cir. 2000] [holding that plaintiff cannot avoid the preclusive effect of res judicata by splitting a claim into various suits with overlapping facts]; Cameron v. Church, 253 F. Supp. 2d 611, 620 [S.D.N.Y. 2003]). Res judicata applies when: (1) the prior proceeding involved an adjudication on the merits; (2)

---

Allstate Ins. Co., 2002 WL 31520500, at *1 [2d Cir. Oct. 31, 2002]; Rosen v. Paul, Hastings, Janofsky & Walker LLP, 2005 WL 1774126, at *2 [S.D.N.Y. Jul. 28, 2005]; NM IQ LLC. v. McVeigh, 2004 WL 2827618, at *7 n.1 [S.D.N.Y. Dec. 9, 2004]; Parkhurst v. Berdell, 110 N.Y. 386, 392 [1888]; In re Capoccia, 272 A.D.2d 838, 847 [3 Dep't 2000]; Beard v. Town of Newburgh, 259 A.D.2d 613, 614 [2d Dep't 1999]). Moreover, a stay is unnecessary in this case since a determination on the district's appeal of Hearing Officer 1's decision in Application of the Bd. of Educ., Appeal No. 10-129 was issued on March 28, 2011. I also note that the general provisions governing discretionary stays in administrative appeals are expressly inapplicable in a review of an impartial hearing officer's decision conducted by a State Review Officer (8 NYCRR 276.1[a], [c], 279.1).

the prior proceeding involved the same parties or someone in privity with the parties; and (3) the claims alleged in the subsequent action were, or could have been, raised in the prior proceeding (Grenon, 2006 WL 3751450, at *6).

    In the instant case, I find that with respect to the parents' claim for tuition reimbursement relative to their son's 2009-10 school year at the NPS, the elements of res judicata have been met. As for the first requirement, the prior impartial hearing resulted in a final adjudication on the merits, whereby Hearing Officer 1 determined that the parents were entitled to reimbursement for the student's tuition and expenses at the NPS for the 2009-10 school year (Dist. Ex. 5 at pp. 44-45). With respect to the second requirement, the prior proceeding involved the same parties as in this appeal (compare Dist. Exs. 1; 2, with Dist. Ex. 5 at pp. 17-21). As for the third requirement, the record on appeal demonstrates that the claims articulated in the November 2010 due process complaint notice, namely, that the district failed to properly evaluate and classify the student as a student with an emotional disturbance, that it failed to provide the student with an educational program sufficient to address his needs, that the NPS was an appropriate placement for the student, and that the parents were entitled to reimbursement for tuition and related expenses for the student's 2009-10 school year at the NPS, were raised and adjudicated at the prior impartial hearing (compare Dist. Ex. 1, with Dist. Ex. 5 at pp. 17-48; see Grenon, 2006 WL 3751450, at *6, quoting Perez, 347 F.3d at 426 [internal quotations omitted] ["The doctrine of res judicata precludes parties from litigating issues that were or could have been decided in a prior proceeding"]; Heimbach v. Chu, 744 F.2d 11, 14 [2d Cir. 1984] [noting that a claim that could have been asserted under a given set of facts in a concluded action is barred from being asserted under the same set of facts in a subsequent action]; Saylor v. Lindsley, 391 F.2d 965, 968 [2d Cir. 1968] [stating that res judicata operates to bind the parties both as to issues actually litigated and determined in the first suit, and to those grounds or issues which might have been, but were not, actually raised and decided in that action]). I further note that the parents' argument that Hearing Officer 2 was required to conduct a hearing because the district failed to challenge the sufficiency of the November 2010 due process complaint lacks merit. A party is not precluded from seeking to use other summary procedures such as dismissal on res judicata grounds with respect to some or all of the opposing party's claims where it becomes clear that a need for further hearing is unnecessary (Application of the Bd. of Educ., Appeal No. 10-129). This is particularly true where, as here, the parents were given a full and fair opportunity to present evidence with respect to material and relevant facts in Hearing I (J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 69 [2d Cir. 2000]; Application of the Bd. of Educ., Appeal No. 10-129). Consequently, the impartial hearing officer correctly relied on a summary disposition procedure insofar as the parents are precluded from re-litigating their tuition reimbursement claim for the 2009-10 school year.

    Turning now to the parents' claim for tuition reimbursement for the 2010-11 school year at the NPS, I note that Hearing Officer 1 declined to consider the merits of the 2010-11 claim in Hearing I on the ground that the claim was premature (see Dist. Ex. 5 at p. 17; Application of the Bd. of Educ., Appeal No. 10-129). However, in this proceeding, the parents filed their due process complaint notice in November 2010 after an additional nine months had passed (see Dist. Ex. 1 at p. 1), thereby rendering their tuition reimbursement claim for the 2010-11 school year a live controversy that had become ripe for adjudication. Furthermore, I find the doctrine of res judicata inapplicable to the parents' tuition reimbursement claim for the 2010-11 school year

because no final decision on the merits of their claim was reached after Hearing I (see Dist. Ex. 5 at p. 44; Application of the Bd. of Educ., Appeal No. 10-129).

Based on the foregoing, I find that Hearing Officer 2's dismissal of the parents' claim for tuition reimbursement for the 2010-11 school year was improper, and I will annul that portion of his decision. Accordingly, I will remand this matter to Hearing Officer 2 for a new impartial hearing on the issue of the parents' tuition reimbursement claim for the 2010-11 school year. Given that two due process complaint notices with overlapping factual bases have been filed with respect to this student, and that the parties and Hearing Officer 1 experienced difficulty identifying the issues to be determined in Hearing I, I strongly encourage Hearing Officer 2 to conduct a prehearing conference, prior to receiving evidence, for the purposes of (1) ascertaining whether any other due process complaint notice has been filed by the parents with respect tuition reimbursement at the NPS arising out of events relating to the 2010-11 school year;[8] (2) ascertaining whether the parents wish to be given a further opportunity to identify the nature of the problem related to their 2010-11 tuition reimbursement claim by filing an amended due process complaint notice; (3) providing the district with an opportunity to be heard with respect to the scope of the impartial hearing; and (4) permitting the impartial hearing officer to resolve any remaining conflict over the scope of the impartial hearing, narrow the issues to be decided if possible, and clarify the issues that will be resolved through the impartial hearing (see 8 NYCRR 200.5[j][3][iii], [xi]).

I have considered the parties' remaining contentions and find them to be without merit.

**THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

**IT IS ORDERED** that the portion of the decision of Hearing Officer 2 which dismissed the parents' claim for tuition reimbursement for the 2010-11 school year as precluded under the doctrine of res judicata is annulled; and

**IT IS FURTHER ORDERED** that this matter is remanded to Hearing Officer 2 for an impartial hearing, within 30 days of the date of this decision, on the parents' claim for tuition reimbursement for the student's 2010-11 school year at the NPS, unless the parties otherwise agree or another impartial hearing is being or has been conducted on this issue; and

**IT IS FURTHER ORDERED** that if Hearing Officer 2 is not available to conduct the new impartial hearing, a new impartial hearing officer be appointed.

Dated:    Albany, New York
        April 19 , 2011

                                        JUSTYN P. BATES
                                        STATE REVIEW OFFICER

---

[8] There is no indication in the hearing record of the existence of any other pending due process complaint notices or related litigation in any other forum relative to the parents' tuition reimbursement claim for the 2010-11 school year.

6

**Exhibit C**



# The University of the State of New York

## The State Education Department
### State Review Officer
www.sro.nysed.gov

No. 11-153

Application of the BOARD OF EDUCATION OF THE
BRENTWOOD UNION FREE SCHOOL DISTRICT for
review of a determination of a hearing officer relating to the
provision of educational services to a student with a disability

**Appearances:**
Ingerman Smith, LLP, attorneys for petitioner, Edward H. McCarthy, Esq., of counsel

Law Offices of Wayne J. Schaefer, LLC, attorneys for respondents, Wayne J. Schaefer, Esq., of
counsel

## DECISION

Petitioner (the district) appeals from the decision of an impartial hearing officer which
found that it violated the child find provisions of the Individuals with Disabilities Education Act
(IDEA) (20 U.S.C. §§ 1400-1482) and awarded full tuition reimbursement to the respondents
(the parents) for their son's tuition costs at a nonpublic high school (NPS) for the 2010-11 school
year. The appeal must be sustained in part.

According to the hearing record, the student experienced a "paranoid episode" and
received diagnoses of a depressive disorder, anxiety, and behavioral problems secondary to
reported peer bullying dating back to the 2007-08 school year (Dist Exs. A at pp. 2-5, 7-8; C at
pp. 1, 5; D at pp. 1-2; E at pp. 3, 14-18, 47, 49-53, 55-59, 63, 66, 68). The NPS has not been
approved by the Commissioner of Education as a school with which school districts may contract
to instruct students with disabilities (see 8 NYCRR 200.1[d], 200.7). The student's eligibility for
special education and related services as a student with an emotional disturbance is in dispute in
this appeal (see 34 C.F.R. § 300.8[c][4][i]; 8 NYCRR 200.1[zz][4]).

## Background

The student's educational history was recently discussed in Application of a Student
Suspected of Having a Disability, Appeal No. 11-023 and Application of the Bd. of Educ.,
Appeal No. 10-129, and will not be repeated here in detail. In the former proceeding, the parents

filed a due process complaint notice dated November 15, 2010 (which is also the subject of the instant appeal) requesting an impartial hearing to adjudicate their claims and sought relief including, among other things, reimbursement for the cost of their son's tuition at the NPS for the 2010-11 school year (Application of a Student Suspected of Having a Disability, Appeal No. 11-023; see also Dist. Ex. A). The impartial hearing officer in that proceeding dismissed the parents' November 15, 2010 due process complaint notice, finding that it was barred by the doctrine of res judicata (Application of a Student Suspected of Having a Disability, Appeal No. 11-023; see Application of the Bd. of Educ., Appeal No. 10-129; Dist. Ex. I at p. 22). The parents appealed the dismissal and I determined that the doctrine of res judicata was inapplicable with respect to the parents' tuition reimbursement claim for their son's 2010-11 school year at the NPS, reinstated their tuition reimbursement claim for the 2010-11 school year, and remanded the case for an impartial hearing to consider the merits of the parents' 2010-11 tuition reimbursement claim (Application of a Student Suspected of Having a Disability, Appeal No. 11-023). This claim is the subject of the appeal at bar.

**Due Process Complaint Notice**

The November 15, 2010 due process complaint notice (Dist. Ex. A) and the district's response (Dist. Ex. B) were recently described in Application of a Student Suspected of Having a Disability, Appeal No. 11-023, and need not be discussed in their entirety. Allegations contained in the due process complaint notice germane to the appeal at bar included that the district had reason to suspect that the student had an emotional disturbance as defined in State and federal regulations, yet the district failed to refer him to the Committee on Special Education (CSE) for an initial evaluation, and that the NPS was an appropriate placement for the student for the 2010-11 school year (Dist. Ex. A at pp. 2-8). The parents sought tuition reimbursement for the student's 2010-11 school year at the NPS or, alternatively, an order from an impartial hearing officer directing the district to refer the student to the CSE for evaluation of his eligibility to receive special education and related services as a student with a disability (id. at pp. 5, 8).

As it pertains to this appeal, the district's November 23, 2010 response to the due process complaint notice asserted that the district did not have an obligation to offer the student a free appropriate public education (FAPE) because the student attended a nonpublic school located outside the district, the student did not have a specific physical or mental condition which adversely impacted upon his educational performance to the extent that he required special education programs and/or related services, the NPS was not an appropriate placement for the student, and equitable considerations favored the district (Dist. Ex. B at pp. 3-5).

**Impartial Hearing Officer Decision**

Consonant with my order in Application of a Student Suspected of Having a Disability, Appeal No. 11-023, an impartial hearing on the issue of the parents' claim for tuition reimbursement for the student's 2010-11 school year at the NPS reconvened on May 11, 2011, and concluded on September 2, 2011, after five additional days of proceedings.[1] On October 18,

---

[1] The hearing record reflects that during the impartial hearing giving rise to the instant appeal, the impartial hearing officer admitted into evidence the entire documentary record (consisting of 72 pages) and the entire hearing transcript (consisting of 839 pages) from the underlying impartial hearing in Application of a Student Suspected of Having a Disability, Appeal No. 10-129 as District Exhibits "E" and "F," respectively (see Tr. pp. 111-12).

2011, the impartial hearing officer issued a decision finding, among other things, that the district had failed to meet its child find obligation and denied the student a FAPE for the 2010-11 school year, that the NPS was an appropriate placement for the student for the 2010-11 school year, and that the parents were entitled to tuition reimbursement for the student's 2010-11 school year at the NPS (IHO Decision at pp. 1-3).

Specifically, the impartial hearing officer found that "[s]ince it ha[d] already been found that the failure to refer the student to the [d]istrict's CSE in the prior year [2009-10] constitute[d] a failure to provide [a] FAPE, the continuation of the failure to refer the student to the CSE continue[d] the lack of [a] FAPE in the 2010-11 school year" (IHO Decision at p. 1). In finding the NPS an appropriate placement for the student for the 2010-11 school year, the impartial hearing officer concluded that the NPS provided the student with "a general education without being subjected to the peer bullying that occurred in the district's high school," and that "the student had a successful school year in his NPS placement" (id. at pp. 2-3). He further noted that there was no evidence that the student required any special education services "except to be removed from the stressor of peer bullying" that had occurred at the district's high school (id. at p. 2). The impartial hearing officer did not address whether equitable considerations supported the parents' claim for tuition reimbursement for the student's 2010-11 school year at the NPS (see id. at pp. 1-3; see also Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 12, 15-16 [1993]; Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369-70 [1985]).

**Appeal for State-Level Review**

The district appeals from the impartial hearing officer's decision, alleging, among other things, that the impartial hearing officer erred in finding the district responsible for evaluating and identifying the student for classification purposes for the 2010-11 school year, and that even if the district were found responsible for identifying and evaluating the student, there was no basis for the district to reasonably suspect that the student had a disability that rendered him eligible to receive special education and related services. The district alleges that the impartial hearing officer erred because he did not address whether the student had met the criteria for emotional disturbance and by reason thereof was in need of special education services for the 2010-11 school year, and the district argues that the student was not eligible for special education services as a student with an emotional disturbance. The district further contends that the impartial hearing officer improperly found, sua sponte, that the parents raised the issue of a denial of a FAPE for the 2010-11 school year in the due process complaint notice, and that this finding was not supported by the evidence contained in the hearing record. The district also alleges that the parents did not meet their burden of proving that the NPS provided a program specially designed to meet the student's unique needs. According to the district, equitable considerations favored the district and the impartial hearing officer erred by failing to address equitable considerations in the decision before awarding the parents tuition reimbursement. The district seeks reversal of the impartial hearing officer's decision in its entirety.

3

The parents answer,[2] countering, among other things, that the impartial hearing officer correctly determined that the district was responsible for evaluating and identifying the student for classification purposes for the 2010-11 school year; that the parents properly alleged a denial of a FAPE for the student's 2010-11 school year in the due process complaint notice; and that the parents satisfied their burden of proving that the NPS was an appropriate placement for the student for the 2010-11 school year. The parents seek dismissal of the district's petition and for the impartial hearing officer's October 18, 2011 decision to be upheld.

**Applicable Standards**

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove v. T.A., 129 S. Ct. 2484, 2491 [2009]; Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 [1982]).

In 2007, New York State amended Education Law § 3602-c to comply with the reauthorization of 20 U.S.C. § 1412(a)(10) ("Children in Private Schools") and its implementing regulations, 34 C.F.R. §§ 300.130-300.147 (see Educ. Law § 3602-c as amended by Ch. 378 of the Laws of 2007; Dist. Ex. G). In September 2007, the Office of Vocational and Educational Services for Individuals with Disabilities (VESID) published a guidance memorandum— "Chapter 378 of the Laws of 2007—Guidance on Parentally Placed Nonpublic Elementary and Secondary School Students with Disabilities Pursuant to the [IDEA] 2004 and New York State (NYS) Education Law Section 3602-c"—to "inform school districts of their responsibilities to provide special education services to students with disabilities who are enrolled in nonpublic elementary or secondary schools by their parents" (Dist. Ex. G at p. 1).[3, 4]   Education Law § 3602-c—commonly referred to as the dual-enrollment statute—requires parents who seek to obtain educational services for students with disabilities placed in nonpublic schools to file a request for such services in the district of location where the nonpublic school is located on or

---

[2] The parents' memorandum of law, which was served together with their answer, exceeds 20 pages in length. State regulations provide that a petition, answer, or memorandum of law shall not exceed 20 pages in length and that a State Review Officer may reject a pleading or memorandum of law that does not comply with the regulations governing practice before the Office of State Review (8 NYCRR 279.8[a][5]). While I will exercise my discretion and consider the parents' memorandum of law in this appeal, I remind parents' counsel to ensure compliance with these regulations in future appeals before the Office of State Review.

[3] Available at http://www.p12.nysed.gov/specialed/publications/policy/nonpublic907.pdf. United States Education Department guidance can be found in the Federal Register at: Child Find for Parentally-Placed Private School Children with Disabilities (§ 300.131) 71 Fed. Reg. 46593 (August 14, 2006): "If a determination is made by the LEA [local educational agency] where the private school is located that a child needs special education and related services, the LEA where the child resides is responsible for making FAPE available to the child. If the parent makes clear his or her intention to keep the child enrolled in the private [school] located in another LEA, the LEA where the child resides need not make FAPE available to the child" (See Maine School Administrative District #40, 108 LRP 40513 [ME SEA, Oct. 23, 2007] [interpreting and applying the federal guidance and concluding that a district of location was not required to create an IEP for a student given the parent's intention to keep a student in a private boarding school]).

[4] The branch of VESID that formerly addressed programs for student's with disabilities under the IDEA is now located in the Office of Special Education (see http://www.p12.nysed.gov/specialed/).

before the first day of June preceding the school year for which the request for services is made (Educ. Law § 3602-c[2]). The district of location's CSE must review the request for services and develop an individualized education service program (IESP) based upon the student's individual needs and "in the same manner and with the same contents" as an IEP (id. § 3602-c[2][b][1]). In addition, the district of location's CSE "shall assure that special education programs and services are made available to students with disabilities attending nonpublic schools located within the school district on an equitable basis, as compared to special education programs and services provided to other students with disabilities attending public or nonpublic schools located within the school district" (id.).

## Discussion

### Sufficiency of the Due Process Complaint Notice

Preliminarily, I will address the district's argument that the parents failed to allege that the district denied the student a FAPE for the 2010-11 school year in their due process complaint notice. A party requesting an impartial hearing may not raise issues at the impartial hearing that were not raised in its original due process complaint notice unless the other party agrees (20 U.S.C. § 1415[f][3][B]; 34 C.F.R. §§ 300.508[d][3][i], 300.511[d]; 8 NYCRR 200.5[j][1][ii]) or the original due process complaint is amended prior to the impartial hearing per permission given by the impartial hearing officer at least five days prior to the impartial hearing (20 U.S.C. § 1415[c][2][E][i][II]; 34 C.F.R. § 300.508[d][3][ii]; 8 NYCRR 200.5[i][7][b]; see M.R. v. South Orangetown Cent. Sch. Dist., 2011 WL 6307563, at *12-*13 [S.D.N.Y. Dec. 16, 2011]; C.D. v. Bedford Cent. Sch. Dist., 2011 WL 4914722, at *13 [S.D.N.Y. Sept. 22, 2011]; R.B. v. Dep't of Educ., 2011 WL 4375694, at *6 [S.D.N.Y. Sept. 16, 2011]; W.M. v. Lakeland Cent. Sch. Dist., 2011 WL 1044269, at *8 [S.D.N.Y. Mar. 10, 2011]; M.P.G. v. New York City Dep't of Educ., 2010 WL 3398256, at *8 [S.D.N.Y. Aug. 27, 2010]; Application of the Bd. of Educ., Appeal No. 11-111; Application of a Student with a Disability, Appeal No. 11-100; Application of a Student with a Disability, Appeal No. 11-042; Application of the Bd. of Educ., Appeal No. 11-038; Application of a Student with a Disability, Appeal No. 11-008).

In this case, I find that while the specificity of the parents' due process complaint notice may not have comported with pleading requirements in a court of law, for purposes of an administrative hearing under the IDEA, the due process complaint notice provided the district with notice that the parents wanted an impartial hearing pursuant to State regulations regarding the evaluation and educational placement of the student, who they suspected of having a disability (Dist.Ex. A at p. 1; see Application of a Student Suspected of Having a Disability, Appeal No. 11-023). Additionally, the parents noted that they intended to seek tuition reimbursement for their unilateral placement of the student at the NPS for the 2010-11 school year (Dist. Ex. A at pp. 4, 8). Thus, I find that the due process complaint notice can be reasonably read as providing notice that the nature of the problem included that the district denied the student a FAPE for the 2010-11 school year and, consequently, the impartial hearing officer properly reached this issue.[5]

---

[5] Conversely, merely alleging a denial of FAPE, without more, would not adequately describe the nature of the problem and would simply indicate the ultimate conclusion that the complaining party would prefer the fact finder to reach. If a district has not challenged a due process complaint notice within the statutory timeframes, a prehearing conference is the time to clarify concerns regarding the issues to be addressed in an impartial hearing (see Application of a Child with a Disability, Appeal No. 06-065).

### Child Find

Although the district acknowledges that it did not develop an IEP for the student for the 2010-11 school year or evaluate the student in relation to the development of an IEP for the 2010-11 school year, the district argues in its petition that the impartial hearing officer erred in finding the district, as the district of residence, responsible for evaluating the student, determining the student's eligibility to receive special education programs and related services, and developing an IEP for the 2010-11 school year. In particular, the district argues that it had none of these obligations to the student in this case because the parents' actions made it clear that they intended to continue the student's enrollment at the NPS, which was located outside the district, for the 2010-11 school year, and therefore, the evaluation, identification, and classification of the student was the responsibility of the district of location. However, for the reasons discussed below, I find that the district's argument is misplaced.

In this case, the district's director of special services (director) testified during the impartial hearing that the district discharged its child find responsibilities in accordance with written procedures (Tr. pp. 128-35; Dist. Ex. H). However, these procedures addressed only students attending nonpublic schools within the district's geographical boundaries, and did not contemplate the circumstances presented under the facts of this case, in which the NPS was located outside of the district's geographical boundaries (see Dist. Ex. H at p. 1). When asked during the impartial hearing if, as part of its child find responsibilities, the district ever reached out to private schools that enrolled district students located outside of the district's geographical boundaries, the director responded "[n]o. If we get notification from one of those schools that a parent has moved into one of those districts, and they request an IEP from us, then we send it" (Tr. p. 130).

The district relies principally upon the following three questions and answers provided in the September 2007 VESID guidance memorandum in support of its argument:

6.  Which school district has the responsibility to conduct the evaluation to determine if a parentally placed nonpublic school student is eligible for special education?

The **district of location** is responsible to conduct the evaluation to determine a student's eligibility for special education. The district of location is also the district that must obtain the informed written consent of the parent to conduct the initial evaluation or reevaluation.

7.  Which school district would convene a meeting of the CSE to determine the student's eligibility and develop the IESP?

If a student is parentally placed in a nonpublic school and is suspected of having a disability, the district of location is responsible to conduct the CSE meeting to determine a student's eligibility for special education and, if determined eligible for special education, to recommend the special education services the student will receive and document such recommendations on an IESP.

6

8. Is it possible for a parent to request evaluations from the district where the nonpublic school is located as well as the district where the child resides?

Yes, but it is generally not advisable because subjecting a student to repeated testing by separate school districts in close proximity of time may not be the most effective or desirable way to ensure that the individual evaluations are meaningful measures of whether a student has a disability or of obtaining an appropriate assessment of the student's educational needs.

If the district of residence receives a request for an evaluation of a student suspected of having a disability who is parentally placed in a nonpublic school in another district, and the parent is not seeking to enroll the student in the public school, the district of residence should notify the parent or his/her right to request an evaluation from the district of location and the development of an IESP from the district of location. The district of residence, with parental consent to share information, should facilitate the referral to the district of location.

(Dist. Ex. G at pp. 11-12) (emphasis in original).

In addition, the September 2007 VESID guidance memorandum also provides:

11. Must the district of residence develop an IEP for a student who is parentally placed and conduct annual reviews of this IEP?

USED has provided guidance that states: "If a determination is made through the child find process by the LEA (local educational agency) where the private school is located that a child needs special education and related services and a parent makes clear his or her intent to keep the child enrolled in the private elementary or secondary school located in another LEA, the LEA where the child resides need not make FAPE available to the child." Therefore, if the parents make clear their intention to keep the child enrolled in the nonpublic elementary or secondary school, the district of residence need not develop or annually review an IEP for the student.

(id. at p. 13).

In this case, although the hearing record indicates that the director did endeavor to facilitate the referral of the student to the district of location, when, during a telephone conversation, she provided the student's mother with the district of location's contact telephone number and advised her of the name of the district of location's director of special education (see Tr. pp. 163-64), the parents ultimately did not contact the district of location and attempt to initiate evaluation procedures, did not seek to obtain special education programs and services from the district of location, did not furnish consent to the district to share the student's information with the district of location, did not have the student evaluated by the district of location, and did not accept an IESP developed by the district of location or accept services provided by the district of location (Tr. pp. 127-28, 164-65, 202; Dist. Ex. J; cf. Application of the Bd. of Educ., Appeal No. 10-049; Application of a Student with a Disability, Appeal No. 09-133). Thus, there is no evidence here that the district of location had already determined

7

"through the child find process . . . that the child needs special education and related services," which is the necessary condition precedent to displacing the district's obligation to evaluate the student, determine the student's eligibility to receive special education programs and related services, and, if appropriate, develop an IEP for the student (Dist. Ex. G at p. 13; Application of a Student with a Disability, Appeal No. 11-011 [finding that the district of residence remained responsible for evaluating the student and determining eligibility because the district of location had not determined that the student required special education).

Moreover, even if the parents had actively pursued an evaluation of the student with the district of location, they would not have been precluded from seeking an evaluation from the district as well, because, contrary to the district's assertion, the obligation of the district of residence to provide a FAPE does not terminate because a student has been privately educated elsewhere – rather, the IDEA's obligations may be shared with the district of location, and Education Law § 3602-c "does not imply that parents may not also seek a FAPE for a privately placed child from the district of the parents' residence" (J.S. v. Scarsdale Union Free Sch. Dist., 2011 WL 5925309, at *27-*29 [S.D.N.Y.Nov. 18, 2011] [emphasis in original]; see Dist. Ex. G at p.12). In addition, the United States Department of Education's Office of Special Education Programs (OSEP) has opined that under child find duties, a district that is responsible for offering a student a FAPE must not decline a parent's request to conduct an eligibility evaluation of the student even if the student is attending a private school located in another district (Letter to Eig, 52 IDELR 136 [OSEP 2009]; see Moorestown Tp. Bd. of Educ. v. S.D., 2011 WL 4345433, *9-*10 [D.N.J. Sept. 15, 2011]; Regional Sch. Dist. No. 9 Bd. of Educ. v. Mr. and Mrs. M., 2009 WL 2514064, at *10 [D.Conn. Aug. 7, 2009]; District of Columbia v. Abramson, 493 F. Supp.2d 80, 84-85 [D.D.C. 2007] [rejecting the proposition that a district of residence did not have a child find obligation due to the fact that the student was parentally placed in a private school in another district and finding that both public school districts retained child find obligations]; Application of a Student with a Disability, Appeal No. 11-011; Application of the Bd. of Educ., Appeal No. 09-067; see also Application of a Student with a Disability, Appeal No. 10-049). Accordingly, I find that under the facts and circumstances of this case, the fact that the student was being educated in a nonpublic school outside of the district did not extinguish the district's child find obligations under the IDEA and State and federal regulations, and that the district remained responsible for evaluating the student, determining the student's eligibility for special education programs and related services and, if appropriate, developing an IEP for the student for the 2010-11 school year.

Alternatively, the district argues that even if a tenable child find duty on its part existed under the IDEA and State and federal regulations, its failure to evaluate the student for the 2010-11 school year was excusable because the district lacked a reasonable basis to suspect that the student had a disability and was in need of special education programs and related services. After careful review, I do not find that the hearing record in this case supports the district's argument. Initially, I note that the hearing record indicates that the parents neither requested the district to evaluate the student for the 2010-11 school year nor provided consent for the district to do so (Tr. pp. 283, 295-97, 299-301, 329-30), and that the district did not request parental consent to evaluate the student (Tr. p. 280; Dist. Ex. J).

However, the purpose of the "child find" provisions of the IDEA are to identify, locate, and evaluate students who are suspected of being a student with a disability and thereby may be in need of special education and related services, but for whom no determination of eligibility as

a student with a disability has been made (see Handberry v. Thompson, 446. F.3d 335, 347-48 [2d Cir. 2006]; A.P. v. Woodstock Bd. of Educ., 572 F.Supp.2d 221, 225 [D. Conn. 2008] aff'd, 2010 WL 1049297 [2d Cir. March 23, 2010]; see also 20 U.S.C. § 1412[a][3][A]; 34 C.F.R. § 300.111; 8 NYCRR 200.2[a][7]). The IDEA places an affirmative duty on State and local educational agencies to identify, locate, and evaluate all children with disabilities residing in the State "to ensure that they receive needed special education services" (20 U.S.C. § 1412[a][3]; 34 C.F.R. § 300.111[a][1][i]; Forest Grove, 129 S. Ct. at 2495; see 20 U.S.C. § 1412[a][10][A][ii]; see also 8 NYCRR 200.2[a][7]; New Paltz Cent. Sch. Dist. v. St. Pierre, 307 F. Supp. 2d 394, 400, n.13 [N.D.N.Y. 2004]). The "child find" requirements apply to "children who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade" (34 C.F.R. § 300.111[c][1]; see 8 NYCRR 200.2[a][7]). To satisfy the requirements, a board of education must have procedures in place that will enable it to find such children (Application of a Student Suspected of Having a Disability, Appeal No. 10-009; Application of a Student Suspected of Having a Disability, Appeal No. 09-132; Application of a Child with a Disability, Appeal No. 07-062; Application of a Child Suspected of Having a Disability, Appeal No. 05-090; Application of a Child with a Disability, Appeal No. 04-054; Application of a Child Suspected of Having a Disability, Appeal No. 01-082; Application of a Child with a Disability, Appeal No. 93-41).

Because the child find obligation is an affirmative one, the IDEA does not require parents to request that the district evaluate their child (Application of a Student Suspected of Having a Disability, Appeal Nos. 11-092 & 11-094; Application of a Child Suspected of Having a Disability, Appeal No. 05-127; Application of a Child Suspected of Having a Disability, Appeal No. 05-040; Application of a Child with a Disability, Appeal No. 03-043; Application of a Child Suspected of Having a Disability, Appeal No. 01-082). A district's child find duty is triggered when there is "reason to suspect a disability and reason to suspect that special education services may be needed to address that disability" (New Paltz, 307 F. Supp. 2d at 400, n.13, quoting Dep't of Educ. v. Cari Rae S., 158 F. Supp. 2d 1190, 1194 [D. Haw. 2001]; see Application of a Child Suspected of Having a Disability, Appeal No. 06-092; Application of a Child Suspected of Having a Disability, Appeal No. 06-087; Application of a Child Suspected of Having a Disability, Appeal No. 05-127; Application of a Child Suspected of Having a Disability, Appeal No. 05-040; Application of a Child Suspected of Having a Disability, Appeal No. 04-087; Application of the Bd. of Educ., Appeal No. 04-037; Application of a Child with a Disability, Appeal No. 03-043; Application of a Child with a Disability, Appeal No. 02-092; Application of a Child Suspected of Having a Disability, Appeal No. 01-082). To determine that a child find violation has occurred, school officials must have overlooked clear signs of disability and been negligent by failing to order testing, or have no rational justification for deciding not to evaluate (A.P., 572 F.Supp.2d at 225, quoting Bd. of Educ. v. L.M., 478 F.3d 307, 313 [6th Cir. 2007]). States are encouraged to develop "effective teaching strategies and positive behavioral interventions to prevent over-identification and to assist students without an automatic default to special education" (Los Angeles Unified Sch. Dist. v. D.L., 548 F.Supp.2d 815, 819 [C.D.Cal. 2008], referencing 20 U.S.C. § 1400[c][5]). Additionally, the school district must initiate a referral and promptly request parental consent to evaluate a student to determine if the student needs special education services and programs if a student has not made adequate progress after an appropriate period of time when provided instruction in a school district's response to intervention program (8 NYCRR 200.4[a]).

9

In this case, the director acknowledged that, in formulating her conclusion an evaluation of the student was unnecessary, she considered evidence presented during the prior impartial hearing relative to the 2009-10 school year, including testimony suggesting that the student "was improving, and was making progress at the [NPS]," "was putting out good effort and was maintaining good academic standing [at the NPS]," was forming positive relationships with teachers and peers at the NPS, had demonstrated an improvement in his moderate depression since leaving the district high school, and was not receiving counseling services at the NPS,[6] in addition to a discussion with the district of location's special education director, who shared with her a June 16, 2011 letter from district of location's school psychologist stating that "I have had the occasion to meet with [the student] on several occasions over the past two years. ... Based on conversations with [the student] last year, I did have anger management concerns for him that were expressed to administration. However, I did not see him as emotionally disabled," and added "[h]e definitely had some lingering anxiety from his experiences at [the district high school] and was keeping to himself at [the NPS] .... [He] continues to be quiet and keep to himself, but is no longer having apparent difficulties with other students" (Tr. pp. 135-36, 142-59, 167-68, 202-03; Dist. Ex. J; see Tr. pp. 111-12; Dist. Ex. F; Application of a Student Suspected of Having a Disability, Appeal No. 10-129).

However, the director also testified that "sometime in the school year of 2010-11," she received a telephone call from the student's mother, during which the student's mother "mentioned that the student was still having some ... concerns, he was still having some problems," and that the director "assumed that they had ... to do with emotional issues" (Tr. pp. 159-60). The director added that she advised the student's mother that "if he was a student here, we could talk about possibly a referral and we would have some evaluations done. But ... because he is no longer a student in [the district] ... the obligation actually falls on the district of location to do the evaluations and to have a CSE if she wants to go that route" (Tr. p. 160). This testimony strongly suggests that the district's decision not to refer the student for evaluation by the CSE stemmed not from a lack of reasonable suspicion that he may have had a disability and needed special education programs and related services, but rather from the district's belief that the responsibility to evaluate the student rested with the district of location. Furthermore, the hearing record reflects that the district possessed sufficient information, developed after the student's November 2008 hallway "confrontation" in the district high school and examined in detail during the prior impartial hearing relating to the parents' claims relative to the 2009-10 school year, which identified the student's social/behavioral concerns sufficiently to trigger the district's child find obligation to refer the student to the CSE for evaluation for the 2010-11 school year (see Dist. Exs. E; F; Application of a Student Suspected of Having a Disability, Appeal No. 10-129). In sum, for the reasons discussed above, I find that the evidence contained in the hearing record supports the impartial hearing officer's conclusion that the district violated its child find obligations relative to the student's 2010-11 school year, and therefore, I decline to disturb that aspect of the impartial hearing officer's decision.

---

[6] The hearing record reflects that the student saw a private therapist at the beginning of the 2010-11 school year, but discontinued visits after late November 2010 (see Tr. pp. 382, 444-45). During the impartial hearing, the student's mother testified that the student stopped seeing his private therapist "[s]ometime in the beginning of the [2010-11] school year, in the first quarter or the beginning of the second quarter," because "it really wasn't necessary after he built a rapport with [his guidance counselor at the NPS]," and that the student did not see any "outside professionals" or require hospitalization during the 2010-11 school year (Tr. pp. 289, 348-49).

**Eligibility**

Next, I will consider the consequence of the district's child find violation. The district correctly contends in the petition that the impartial hearing officer, despite finding that it denied the student a FAPE for the 2010-11 school year, did not address the issue of the student's eligibility for special education and related services in the decision (see IHO Decision at pp. 1-3). The parents assert that the student met the criteria for a student with an emotional disturbance under State and federal regulations, and consequently, upon evaluation by the district, should have been found eligible to receive special education programs and related services for the 2010-11 school year (see Dist. Ex. A at pp. 6-7).

Initially, according to State and federal regulations, a student with an emotional disturbance must meet one or more of the following five characteristics:

(A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
(B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
(C) Inappropriate types of behavior or feelings under normal circumstances.
(D) A general pervasive mood of unhappiness or depression.
(E) A tendency to develop physical symptoms or fears associated with personal or school problems.

(34 C.F.R. § 300.8[c][4]; see 8 NYCRR 200.1[zz][4]). Additionally, the student must exhibit one or more of the five characteristics over a long period of time and to a marked degree that adversely affects the student's educational performance (id.; see N.C. v Bedford Cent. Sch. Dist., 2008 WL 4874535 [2d Cir. 2008]; see also Maus v. Wappingers Cent. Sch. Dist., 688 F.Supp.2d 282 [S.D.N.Y. 2010]; A.J. v. Bd. of Educ., 679 F.Supp.2d 299 [E.D.N.Y. 2010]). While the term "emotional disturbance" includes schizophrenia, the term does not apply to students who are socially maladjusted, unless it is determined that they otherwise meet the criteria above (34 C.F.R. § 300.8[c][4]; see 8 NYCRR 200.1[zz][4]; New Paltz, 307 F. Supp. 2d at 398).

However, after careful review, I find that the hearing record is insufficiently developed to determine whether the student met any of the five criteria set forth under the State and federal regulations to become eligible for special education programs and related services as a student with an emotional disturbance. Although I note that the hearing record does contain anecdotal evidence germane to some of the five regulatory criteria for an emotional disturbance (see Tr. pp. 135-39, 141-43, 145-59, 308-25, 347, 383-87, 414, 420-21, 432-33, 475-79; Dist. Exs. E-F; J; Parent Exs. 2-3; 5), considered as a whole, the hearing record is inadequate to reach a reasoned, conclusive finding on the issue of the student's eligibility for special education and related services. Assuming, for the sake of argument that he met at least one of the five criteria, the available evidence does not support the conclusion that it was over a long period of time to a marked degree.

According to the parents' November 15, 2010 due process complaint notice, the student was allegedly the victim of bullying incidents occurring during the 2007-08 and 2008-09 school years, and that on November 5, 2008, one such incident ultimately led to his "removal" from the district high school in mid-November 2008 (Dist. Ex. A at pp. 2-3). The student's private

11

therapist testified during the impartial hearing that in her opinion, the student could not have returned to the district high school for the 2010-11 school year because "he was involved in a cycle of violence ... with his peers and he was a target there ... and it was a toxic environment" and not an appropriate placement for him (Tr. pp. 388-90). She added that the district high school "didn't provide or couldn't provide what [the student] needed, the supports, the sense of security ... the direction ... the one to one contact that he needed" (Tr. p. 428). Additionally, in response to inquiry by the impartial hearing officer, the private therapist opined that the student "could have been sent to any other high school other than [the district high school] without the mental problems that occurred" (Tr. pp. 447-48).

However, the private therapist also acknowledged that she lacked personal knowledge of the services provided to the student at the district high school or how the student performed academically while enrolled in the district high school, and that her opinion "regarding the student's ability to succeed at [the district high school] versus his ability to succeed at [the NPS was] based upon what [the student's mother] told [her]" (Tr. p. 442).

The impartial hearing officer also found "[w]hen bullying reaches a level where a student is substantially restricted in learning opportunities, the student is deprived of a FAPE" (see IHO Decision at pp. 2-3), and, in reaching this conclusion, relied upon T.K. v. New York City Dep't of Educ., 779 F. Supp. 2d 289 (E.D.N.Y. 2011). However, based upon the facts and circumstances of this case, which are distinguishable from those in T.K., I find that the impartial hearing officer's reliance upon T.K. was misplaced, given that in T.K., the student had already been evaluated by the CSE and found to be eligible for special education programs and related services as a student with a disability,[7] and the parents had rejected the district's recommended placement (see 779 F. Supp. 2d 289, 294-95 [E.D.N.Y. April 25, 2011]). In this case, however, the student was not evaluated for special education and related services, consequently, was not found eligible for special education programs and related services, and consequently, received neither an IEP nor a special education placement.

Furthermore, as discussed above, there is no indication in the hearing record that the district requested parental consent to evaluate the student, nor that the parents requested that the district evaluate the student or furnished consent for the district to do so, or that they obtained an updated private evaluation of the student in support of their claim.[8] I also note that the impartial hearing officer did not request an independent educational evaluation (IEE) of the student as part of the impartial hearing, which, in consideration of the lack of recent evaluative data contained in the hearing record, may have aided in further developing the hearing record on this issue (see 20 U.S.C. § 1415[b][1]; 34 C.F.R. § 300.502[d]; 8 NYCRR 200.5[g][2]). However, remand of this case for further development of the hearing record on this issue at this juncture would serve little purpose, because the hearing record demonstrates that the student graduated from the NPS in

---

[7] The student's eligibility in T.K. was not at issue because the student met the criteria for IDEA eligibility and the court was addressing the extent to which the student's special education and related services must be designed to remediate issues related to bullying. It appears that an appeal of this case to the Second Circuit is currently pending.

[8] The only psychiatric evaluations contained in the hearing record in support of the parents' claims that the student had an emotional disturbance and was therefore eligible for special education and related services for the 2010-11 school year were conducted on November 18, 2008 and November 26, 2008, respectively (see Dist. Ex. E at pp. 14-18), almost two years prior to the date of the parents' November 15, 2010 due process complaint notice and more than 30 months prior to the commencement of the impartial hearing in the instant appeal.

June 2011 and was scheduled to attend college in fall 2011 (see Tr. pp. 275, 292; Parent Exs. 2-3). As stated above, the evidence does not lead me to conclude that the student experienced one or more of the five criteria over a long period of time to a marked degree. I am also not convinced that the student required special education services as a result. However, assuming for the sake of argument that the student was denied a FAPE for the 2010-11 school year, I will next consider whether the parents satisfied their burden of proving that the NPS was an appropriate placement for the student for the 2010-11 school year.

### Applicable Standards – Unilateral Placement

A private school placement must be "proper under the Act" (Carter, 510 U.S. at 12, 15; Burlington, 471 U.S. at 370), i.e., the private school offered an educational program which met the student's special education needs (see Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 115 [2d Cir. 2007]; Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998]; Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 [S.D.N.Y. 2007] aff'd, 2008 WL 3852180 [2d Cir. Aug. 19, 2008]). A parent's failure to select a program approved by the State in favor of an unapproved option is not itself a bar to reimbursement (Carter, 510 U.S. at 14). The private school need not employ certified special education teachers or have its own IEP for the student (Carter, 510 U.S. 7; Application of the Bd. of Educ., Appeal No. 08-085; Application of the Dep't of Educ., Appeal No. 08-025; Application of the Bd. of Educ., Appeal No. 08-016; Application of the Bd. of Educ., Appeal No. 07-097; Application of a Child with a Disability, Appeal No. 07-038; Application of a Child with a Disability, Appeal No. 02-014; Application of a Child with a Disability, Appeal No. 01-105). Parents seeking reimbursement "bear the burden of demonstrating that their private placement was appropriate, even if the IEP was inappropriate" (Gagliardo, 489 F.3d at 112; see M.S. v. Bd. of Educ., 231 F.3d 96, 104 [2d Cir. 2000]). "Subject to certain limited exceptions, 'the same considerations and criteria that apply in determining whether the [s]chool [d]istrict's placement is appropriate should be considered in determining the appropriateness of the parents' placement...'" (Gagliardo, 489 F.3d at 112; Frank G. v. Bd. of Educ., 459 F.3d at 364 [2d Cir. 2006] [quoting Rowley, 458 U.S. at 207 and identifying exceptions]). Parents need not show that the placement provides every special service necessary to maximize the student's potential (Frank G., 459 F.3d at 364-65). When determining whether the parents' unilateral placement is appropriate, "[u]ltimately, the issue turns on" whether that placement is "reasonably calculated to enable the child to receive educational benefits" (Frank G., 459 F.3d at 364; see Gagliardo, 489 F.3d at 115 [citing Berger v. Medina City Sch. Dist., 348 F.3d 513, 522 [6th Cir. 2003] [stating "evidence of academic progress at a private school does not itself establish that the private placement offers adequate and appropriate education under the IDEA"]]). A private placement is only appropriate if it provides education instruction specially designed to meet the unique needs of a student (20 U.S.C. § 1401[29]; 34 C.F.R. § 300.39[a][1]; Educ. Law § 4401[1]; 8 NYCRR 200.1[ww]; Rowley, 458 U.S. at 188-89; Gagliardo, 489 F.3d at 114-15 [noting that even though the unilateral placement provided special education, the evidence did not show that it provided special education services specifically needed by the student]; Frank G., 459 F.3d at 365; Stevens v. New York City Dep't of Educ., 2010 WL 1005165, *9 [S.D.N.Y. Mar. 18, 2010]).

The Second Circuit has set forth the standard for determining whether parents have carried their burden of demonstrating the appropriateness of their unilateral placement.

13

> No one factor is necessarily dispositive in determining whether
> parents' unilateral placement is reasonably calculated to enable the
> child to receive educational benefits. Grades, test scores, and
> regular advancement may constitute evidence that a child is
> receiving educational benefit, but courts assessing the propriety of
> a unilateral placement consider the totality of the circumstances in
> determining whether that placement reasonably serves a child's
> individual needs. To qualify for reimbursement under the IDEA,
> parents need not show that a private placement furnishes every
> special service necessary to maximize their child's potential. They
> need only demonstrate that the placement provides educational
> instruction specially designed to meet the unique needs of a
> handicapped child, supported by such services as are necessary to
> permit the child to benefit from instruction.

(Gagliardo, 489 F.3d at 112; see Frank G., 459 F.3d at 364-65).

### Parents' Unilateral Placement – 2010-11 School Year

Assuming, without deciding, that the CSE would have determined that the student was eligible for special education and related services, I find that with respect to the parents' tuition reimbursement claim, the hearing record contains a paucity of evidence describing the student's educational program at the NPS. The only additional documentary evidence from the NPS added to the hearing record developed during the prior impartial hearing conducted in Application of a Student Suspected of Having a Disability, Appeal No. 10-129 consisted of a tuition invoice for the 2010-11 school year, the student's 2010-11 report card, the student's academic transcript, a letter waiving the school's "world language" requirement for the student, the student's individual discipline report for the 2010-11 school year, and a parental release form dated December 14, 2009 (compare Dist. Ex. E, with Parent Exs. 1-6).

With respect to the student's social/emotional functioning, the student's mother testified during the impartial hearing that to address the student's socialization difficulties, NPS staff "encouraged him. They advised him. I don't know of anything else. I'm sure they did many things, but I wasn't there" (Tr. pp. 314-16). She explained that during the 2010-11 school year, her son saw a guidance counselor at the NPS "once or twice a week" and "anybody else [who] would speak with him at any given moment" (Tr. p. 288). She commented that the student "trusted" the guidance counselor, "could talk to him about anything," and that "he helped [the student] cope on a regular basis and he pretty much helped him graduate from therapy outside of school" (Tr. pp. 289, 348-49). The student's mother observed that the student "was becoming more and more social outside of school" and "[h]e started having his friends over again. He started being more social with a lot of people, going out more and [the guidance counselor] just did a very good job with the student" (Tr. pp. 289-90). The student's mother testified that during the 2010-11 school year, she had in excess of ten conversations with the guidance counselor, focusing on the student's difficulties socializing with other people (Tr. pp. 287, 290), and noted that, although at the beginning of the 2010-11 school year the guidance counselor "wanted to see him become more social in school and become part of a group," the student "was afraid that if anybody picked on him and he reacted, he would be thrown out ... [s]o after a little while, [the guidance counselor] agreed that it was best to help him focus on his academics and ... on his

14

relationships outside of school and we were successful with that" (Tr. pp. 290, 318; see Tr. pp. 319-20). Academically, the student's mother testified that the NPS guidance counselor advised the student regarding his academics, and she acknowledged that during the third quarter of the 2010-11 school year, her son was failing four of his eight courses (Tr. p. 308).[9]

The student's NPS guidance counselor, who was the only witness from the NPS to testify on behalf of the parents, testified that he initially met with the student at the beginning of the 2010-11 school year, focusing at first on academics, but then met with the student approximately ten times during the 2010-11 school year, during which he "encouraged [the student] to get involved and to socialize with other students;" however, he also testified that the student responded that "[h]e preferred not to" and that the student "made it perfectly clear that he preferred to be by himself in the school setting, so I accepted that" (Tr. pp. 472-73, 475-79). He also advised that he was unaware of any behavior incidents involving the student arising during the 2010-11 school year at the NPS (Tr. p. 474).

The hearing record also reflects three student visits to his private therapist during the 2010-11 school year, twice in September 2010 and once in November 2010, during which the student discussed his anxiety related to returning to the NPS and his "suspicious feelings" related to a female peer who approached him at the NPS (Tr. pp. 403-07, 444-45; Parent Ex. E at pp. 65-66). The private therapist confirmed that during the 2010-11 school year, she had no direct contact with the student after the student's November 2010 visit, that she spoke with the student's mother "[11] or 12 times" during the 2010-11 school year, and that she had no contact with NPS staff during the 2010-11 school year (Tr. pp. 410-12, 426, 444-45; see Tr. pp. 397-98).

The private therapist opined that the NPS was an appropriate placement for the student because at the NPS, he was not subject to the stressors to which he was exposed at the district high school, and the NPS provided a "level of security and safety for the student to continue to do well based on the trauma that he experienced, the social anxieties he struggled with, [and] the isolation," adding that the NPS "provided a lot of contact, a lot of support ... he saw a guidance counselor on a regular basis. I think at one point ... he had seen the pastor there" (Tr. pp. 388, 393, 394-95). She noted that the NPS seemed to "regulate any situation ... that he was confronted with [to which] he may have reacted in a negative way ... and I don't think that ... [the district high school] offered that for him" (Tr. p. 389; see Tr. pp. 391-92, 395), adding that the NPS had the "mechanisms ... to provide emotional support, social support, academic structure support and ... by having the counselors available, they recognized that ... the student did suffer ... clinical depression" (Tr. p. 395).

However, the private therapist also acknowledged that while she believed that the student's process of "reintegration" would have been less likely to be successful had it occurred at the district high school, she had no personal knowledge of the level of the student's isolation from his peers at the NPS during the 2010-11 school year, the nature of the services and supports provided to the student by the NPS during the 2010-11 school year, or the specific measures, if any, that the NPS employed to address the student's social relationships or academic

---

[9] The student's mother attributed the student's academic difficulties during the third quarter of the 2010-11 school year to mononucleosis, which contributed to the student's "falling asleep in ... class" (Tr. pp. 308-09), but acknowledged during the impartial hearing that some of the student's grades could have been "adversely affected because of the socialization issues he was having" (Tr. p. 347).

15

performance during the 2010-11 school year, other than the information she received through conversations with the student's mother (Tr. pp. 434-36, 440-43).

The impartial hearing officer also found that "[t]here was no evidence in this proceeding that this student needed any further special education accommodation except to be removed from the stressor of peer bullying which occurred in the district's high school" (IHO Decision at p. 2), and there is, in fact, no indication in the hearing record that the student received special education services at the NPS during the 2010-11 school year (see Dist. Ex. F at p. 458). Although the removal of a student from a particular school building in which that student was exposed to peer bullying confers educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not, I find under the facts and circumstances of this case, that it did not satisfy the parents' burden to demonstrate how the program provided at the NPS was specially designed to meet the student's unique needs for the 2010-11 school year; thus, I also find that the parents were not entitled to tuition reimbursement (Gagliardo, 489 F.3d at 115). A unilateral private placement is only appropriate if it provides "education instruction specifically designed to meet the unique needs of a handicapped child" (Gagliardo, 489 F.3d at 115 [quoting Frank G., 459 F.3d at 365]; see also Rowley, 458 U.S. at 188-89). Having determined that the parents did not meet the second criterion for an award of tuition reimbursement, the necessary inquiry is at an end and I need not reach the issue of whether equitable considerations support the parents' claim (see M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 66 [2d Cir. 2000]; C.F. v. New York City Dept. of Educ., 2011 WL 5130101, at *12 [S.D.N.Y. Oct. 28, 2011]; D.D-S. v. Southold Union Free Sch. Dist., 2011 WL 3919040, at *13 [E.D.N.Y. Sept. 2, 2011]).

**Conclusion**

In sum, in consideration of the evidence contained in the hearing record, I disagree with the impartial hearing officer's determinations that the parents satisfied their burden of proving that the NPS was an appropriate placement for the student for the 2010-11 school year and that the parents were entitled to tuition reimbursement for the student's 2010-11 school year at the NPS and, therefore, I will annul those aspects of the impartial hearing officer's October 18, 2011 decision.

I have considered the parties' remaining contentions and find that I need not consider them in light of my determinations.

**THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.**

**IT IS ORDERED** that the portions of the impartial hearing officer's decision dated October 18, 2011 that determined that the parents satisfied their burden of proving that the NPS was an appropriate placement for the student for the 2010-11 school year and that the parents were entitled to reimbursement for their son's tuition and expenses at the NPS for the 2010-11 school year are annulled.

Dated:      Albany, New York
           January 23 , 2012

JUSTYN P. BATES
STATE REVIEW OFFICER

16